HILLMAN, D.J., delivered the opinion of the court, in which DAUGHTREY, J., joined. NORRIS, J. (pp. 1212-13), delivered a separate dissenting opinion.
HILLMAN, District Judge.
Appellant Calvin B. Murphy (“Murphy”) appeals the convictions and sentence arising out of his prosecution as a convicted felon in possession of a firearm and of ammunition in violation of 18 U.S.C. § 922(g)(1). We affirm the convictions, but remand the case for re-sentencing.
I.
At approximately 3:00 a.m. on July 15, 1993, Memphis police officers Terrance Jackson and Robert Covington responded to a call about a suspicious vehicle in northwest Memphis. The officers found a brown LTD parked in a driveway with its lights out and the engine running. As they approached, the driver sped away from the scene. Jackson and Covington pursued the vehicle, but lost sight of it. A few minutes later, the officers heard a crash a short distance away. When they arrived at the crash scene they found the brown LTD had been driven through a chain link fence and into a studio apartment.
The officers got out of their cruiser. As they approached the wrecked car, the driver jumped out and ran into an apartment complex. The officers chased the driver for about five minutes but he evaded them. As he was running away, both officers got a good look at him and were able to give a description. At trial, both officers identified appellant Calvin Murphy as the driver of the vehicle.
While chasing the driver, Jackson and ■ Covington called for assistance. A number of Memphis police officers arrived shortly, including Richard Wehby. After losing sight of the driver, Jackson and Covington returned to the LTD and took an inventory of *-382 its contents. On the seat next to where the driver had been sitting, they found a .38 caliber revolver and a blue knit ski mask.
Memphis police checked the registration of the car and found it was registered to Delores Murphy, defendant’s mother, who lived a short distance from the accident scene. Officer Wehby volunteered to go to Delores Murphy’s home because it was located in his district. At about the same time the vehicle registration was confirmed, Mrs. Murphy herself called the police to report the car stolen.
When Wehby arrived at her home, Delores Murphy told him that her son, defendant Murphy, had awakened her a short time before, informed her that her ear had been stolen, and thereafter left the house. The police asked Mrs. Murphy to call them when her son returned.
When defendant Murphy returned, his mother called the police. Wehby proceeded to Delores Murphy’s home where he arrested defendant and escorted him to his cruiser. Murphy was placed in the rear of the vehicle to await identification by officers Jackson and Covington. Wehby testified that he did not question defendant, but answered defendant’s- question concerning why he was being arrested. Wehby testified that after he had placed defendant in the car, defendant voluntarily stated that he had been driving the ear and that he did not possess a driver’s license.
Officers Jackson and Covington arrived within a matter of minutes. The officers testified that as they got out of their cruisers and approached the police vehicle in which Murphy was seated, they saw Murphy gesticulating and heard him yelling. They testified that no one else was in the vehicle. When the officers opened the door to get a good look at defendant, Murphy spontaneously bragged about having evaded the police. He stated that he knew nothing about the gun and ski mask, though neither officer had mentioned finding those objects.
Delores Murphy subsequently identified both the car and the handgun as hers. At trial, she testified that she stored her handgun under her bed and that her aunt and various nephews had access to her room in her absence. On cross-examination, Delores Murphy admitted that she may have told officers at the time of the arrest that only she and her son knew where the gun was kept. She also admitted on cross-examination that she originally told officer Wehby that she presumed her son had been driving her car on the night of the accident, rather than some other individual.
On February 23,1994, defendant-appellant was indicted on two counts of being a felon in possession of a handgun and of ammunition, in violation of 18 U.S.C. § 922(g)(1). He was convicted on both counts on February 14, 1995, following a jury trial. On May 12, 1995, he was sentenced to a term of incarceration of 24 years and five months.
II.
On appeal, Murphy raises six claims of error. First, he contends that the district court committed clear error when it concluded that he was competent to stand trial. Second, he claims that the court erred in denying his motion to suppress the statements he made to officers Jackson and Cov-ington. Third, he asserts that the district court improperly admitted evidence of the ski mask under Fed.R.Evid. 404(b). Fourth, he claims that insufficient evidence was presented to demonstrate his possession of the firearm. Fifth, he contends that the district court erred in designating him an armed career criminal pursuant to 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4. Finally, he alleges that the statute under which he was convicted was unconstitutional both on its face and as applied because of an insufficient connection with interstate commerce.
We address each claim in turn.
A. Competency to Stand Trial
Before trial, defendant filed a motion for psychiatric examination. Defendant’s attorney advised the court that Murphy reported hearing voices, a circumstance that appeared to be interfering with the attorney’s representation of her client. She also reported that her client appeared to have difficulty fully understanding her advice. As a result, she advised the court that she had concerns about defendant’s competency to stand trial.
*-381 The district court ordered a psychiatric examination. The examining forensic psychiatrists, Dr. Thomas Kucharski and Dr. Leslie Knutson, concluded that defendant was competent to stand trial. They further reported that defendant’s description of auditory hallucinations was not consistent with true auditory hallucinations. It was their conclusion that the false description of auditory hallucinations, together with other test results, strongly suggested that defendant was fabricating mental illness.
The doctors further noted that defendant had borderline intellectual functioning and would need legal concepts explained in a concrete manner and might need them repeated. They determined, however, that his limitations did not rise to the level of a mental defect or prevent Murphy from understanding the proceedings or participating in his own defense. "On the basis of the psychiatric report, the court concluded that defendant was competent to stand trial.
“It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial.” Medina v. California, 505 U.S. 437, 439, 112 S.Ct. 2572, 2573, 120 L.Ed.2d 353 (1992). The test of whether a defendant is competent to stand trial is “whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.” Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). This same standard applies “to questions of whether the defendant has the requisite mental capacity to stand trial.” Williams v. Bordenkircher, 696 F.2d 464, 466 (6th Cir.), cert. denied, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 287 (1983).
Where, as here, the district court has ordered a psychiatric evaluation and held a hearing prior to determining competency, this court reviews the findings of the district court for clear error. United States v. Baker, 807 F.2d 1315, 1320 (6th Cir.1986).
In the instant case, the district court’s decision unquestionably was proper. The only psychiatric evaluation that was conducted concluded that defendant was competent to stand trial. The examiners specifically concluded that they strongly suspected defendant was fabricating his claims of hearing voices. Neither his description of the auditory hallucinations nor his responses on credibility tests supported any other conclusion. Moreover, while the examining psychiatrists found borderline intelligence, they concluded that defendant was capable of understanding what was happening to him. Further they found that he was able to determine when a plea agreement would be to his advantage, that he understood the roles of various court personnel, and that he had sufficient ability to concentrate to be able to follow the proceedings.
At the competency hearing, defendant raised only two challenges to the psychiatric findings. First, counsel reported that defendant continued to complain of hearing voices. As the district court noted, however, similar earlier complaints were found to be highly suspicious by the psychiatrists. Consequently, because the court concluded that defendant’s reports of hearing voices were fabricated, it properly gave little weight to additional such reports.
Second, defendant pointed out that the psychiatric report stated that defendant required repetition to understand. He contended that because such repetition was not possible during the immediacy of trial proceedings, he was constitutionally unable to be fairly tried. The district court rejected defendant’s argument, concluding that the particular psychiatric finding did not undermine the psychiatrist’s conclusion that defendant was competent to stand trial.
We find no error in this analysis. The psychiatric report concluded that legal concepts, in particular, would need to be repeated and explained in concrete terms. At no time did the psychiatrists suggest' that Murphy needed repetition to understand the basic factual information that would form the bulk of the testimony at trial. Moreover, Murphy has not identified a single occasion at trial when he was prejudiced by an inability to understand or to remember. Indeed, the record suggests the opposite.
*-380 At trial, the district judge made numerous efforts to ensure that Murphy understood the proceedings. For example, following jury selection, defense counsel advised the court that she had had difficulty explaining to Murphy that both the government and defendant had a right to challenge jurors. Counsel stated that she believed Murphy finally understood. The court nevertheless addressed Murphy and again explained the voir dire process. The court also invited defendant to ask the court whenever he had questions:
[A]ny time you have any questions, as I indicated earlier, I know you are asking Ms. Ferguson as you should and you’re welcome to ask me if you need to after you have talked with her.
Murphy therefore was on notice that the court would make every effort to answer questions that might arise.
In addition, the court made a detailed inquiry on the record concerning Murphy’s understanding of his right to either testify or not. Neither the district court nor this court is able to find anything in the record that would suggest appellant failed' to comprehend and appreciate this right. Instead, Murphy’s responses reveal his understanding of the considerations involved in his decision whether or not to testify.
Moreover, we note that the district court granted Murphy’s request for a continuance of the sentencing proceeding in' order to allow counsel additional time to consult with her client regarding matters contained in the presentence report that he did not understand. Only after he was fully advised and had exercised his opportunity to challenge the specifics of that report was the sentencing completed.
Having reviewed the entire record, we find no basis for questioning the district court’s conclusion that appellant was competent to stand trial and fully understood the proceedings against him.
B. Motion to Suppress
Appellant next contends that the district court erred in denying his motion to suppress the statements he made to police officers. Appellant asserts that the statements were made without benefit of warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and further that they were coerced and thus involuntary under United States v. Brown, 557 F.2d 541 (6th Cir.1977).
Under Miranda, a defendant must be given warnings about the exercise of his Constitutional rights whenever he is subjected to a “custodial interrogation.” Miranda, 384 U.S. at 444, 86 S.Ct. at 1612. Any questioning that occurs after a defendant’s liberty has been significantly restrained triggers the duty to warn. Id. The duty arises whenever there is “express questioning or its functional equivalent.” Rhode Island v. Innis, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). However, where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of Miranda warnings. United States v. Montano, 613 F.2d 147, 149 (6th Cir.1980).
In reviewing a district court’s decision to admit or suppress evidence, we review the district court’s findings of fact for clear error. United States v. Crowder, 62 F.3d 782, 785 (6th Cir.1995), cert. denied, — U.S. —, 116 S.Ct. 731, 133 L.Ed.2d 682 (1996). Legal conclusions are reviewed de novo. Id.
The government never has disputed that the defendant was in custody nor argued that Miranda warnings were given to defendant before he made his statements. Instead, it claims that because no questioning occurred, any statements made by defendant were entirely voluntary.
At the suppression hearing, officer Jackson testified that Murphy had been speaking before Jackson opened the ear door, even though no one else was present in the vehicle at the time. Both Jackson and Covington stated that when they opened the door to get a good look at defendant, Murphy immediately began bragging about having evaded officers. Both officers denied questioning Murphy.
Murphy presented no evidence at the hearing that would contradict Jackson’s and Cov- *-379 ington’s testimony. Instead, Murphy claimed that when Wehby first placed Murphy in custody and escorted him to the police cruiser, Wehby advised him that things would be easier for him if he talked. Murphy argued that Wehby’s remarks constituted questioning and therefore triggered the duty to give him Miranda warnings.
The magistrate judge concluded that, in light of Murphy’s vague and contradictory testimony, his claim that he had been questioned by Wehby was not credible. The district court adopted the magistrate judge’s recommendation. On appeal, Murphy contends that, because the government presented no testimony from officer Wehby, the district court had no basis for rejecting Murphy’s claim that Wehby questioned him.
We disagree. At the suppression hearing, Murphy made conflicting statements about what happened at the time of his arrest. He claimed that he made no statements to any officer, but that, if the judge did not believe him, any statements he made were made as the result of questioning. The court was entitled to believe the testimony of Jackson and Covington about the spontaneous statements made by defendant. The court also was entitled to conclude that Murphy was not believable when he claimed that Wehby had questioned him.
In fact, such a conclusion was particularly reasonable in this case. Murphy testified that he was left alone in the vehicle until Jackson and Covington approached. It stands to reason that, if Wehby.had pressured Murphy to talk as Murphy claims, Wehby would not thereafter leave Murphy alone in the vehicle. If one has questioned a suspect, presumably one would stay to hear any answers.
Moreover, Wehby testified at trial. He expressly denied questioning Murphy. His testimony at the suppression hearing would have served only to add cumulative evidence for disbelieving Murphy’s version of events.
Finally, as the district judge observed, defendant did not ask the district court to reopen the suppression hearing to take evidence from Wehby. Instead,' defendant asked the district court for a de novo hearing on the suppression issue, without sufficient explanation of the need for such a hearing. We find no error in the court’s conclusion that defendant had raised insufficient grounds for the holding of a de novo eviden-tiary hearing.
In a supplemental brief following the suppression hearing, Murphy contended that his statements, in addition to being made without benefit of Miranda warnings, were coerced. He again raises that claim on appeal. Specifically, Murphy asserts that his placement in a police cruiser was inherently coercive, particularly in light of his limited mental capacity.
In support of his argument, Murphy cites United States v. Brown, 557 F.2d 541, 551 (6th Cir.1977). In Brown, this court observed that there is an “inherent coerciveness of the backseat of a patrol car as a setting for a confession_” Id. Murphy contends that Brown renders his statements coerced.
Murphy, however, reads the comment in Brown far too broadly. As the Brown court itself observed, the critical inquiry in determining the voluntariness of a confession is whether the confession is the product of free and rational choice. Id. at 546. The court must look at the totality of the circumstances to determine whether the defendant’s will was overborne. Id. The Brown court found voluntariness to be lacking where a variety of factors suggested coercion. In Brown, the defendant confessed after being confined with police officers during an investigation of the shooting and killing of a police officer and the wounding of several others. The defendant was overwrought and crying and appeared to have been severely beaten.
In contrast, defendant in this case was escorted to a police car outside his home and was left in it for a matter of a few minutes until he could be identified. While a police car may in some circumstances be a coercive setting for a protracted interrogation, there was no interrogation in this case. Moreover, defendant has cited no case holding that coercion may be proved solely on the basis of placement in a police cruiser.
*-378 We acknowledge that low intelligence and lack of warning may be factors in determining voluntariness. See Schneckloth v. Bustamonte, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058-59, 36 L.Ed.2d 854 (1973); Crowder, 62 F.3d at 787. However, as this court held in United States v. Macklin, 900 F.2d 948, 951 (6th Cir.), cert. denied, 498 U.S. 840, 111 S.Ct. 116, 112 L.Ed.2d 86 (1990), those factors alone form an insufficient basis for concluding that a defendant is incapable of exercising free will. In the absence of other factors that would suggest coercion, we conclude that Murphy’s statements were not coerced.
In light of the totality of the circumstances, we find no error in the district court’s decision to deny defendant’s motion to suppress his statements.
C. Ski Mask
Appellant contends that the district court erred when it admitted evidence of the ski mask. He claims that the ski mask constitutes evidence of another bad act that should be excluded under Fed.R.Evid. 404(b). He asserts that the presence of a homemade ski mask in the front seat of a car in Memphis in August suggests that the mask was intended to be used during criminal conduct.
In reviewing a decision to admit evidence under Rule 404(b), this court applies a three-part standard. United States v. Merriweather, 78 F.3d 1070, 1073 (6th Cir.1996). First, it reviews the factual findings of the district court for clear error. Second, the court reviews de novo the district court’s legal determination that the evidence was admissible for a legitimate purpose. Finally, the court reviews for abuse of discretion the district court’s determination that the probative value of the evidence is not substantially outweighed by its unfairly prejudicial effect. Merriweather, 78 F.3d at 1073; United States v. Johnson, 27 F.3d 1186, 1190 (6th Cir.1994), cert. denied, 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995).
Where a defendant has objected to 404(b) evidence, the government must articulate a legitimate, specific purpose for the admission of the evidence. The district court then must determine whether the evidence is “material” or “in issue” in the case. Id.
In the instant case, the government argued that it was required to prove that defendant had knowing possession of the firearm. The government contended that the mere presence of the gun in the car was not sufficient evidence to prove that defendant had knowing possession of it. Consequently, it was required to prove that defendant had the intent to control the gun. The presence of the ski mask, the government argued, tended to prove that defendant was aware of the gun’s presence because it suggested that he had an intent to use it. In support of its argument, the government referred the district court to United States v. Hatfield, 815 F.2d 1068, 1072 (6th Cir.1987).
In Hatfield, the defendant denied knowing that a firearm was in the van. The Hatfield court allowed the admission of evidence of certain burglary tools found with the weapon. The court held that the presence of the burglary tools tended to prove the defendant was aware of the weapon. On the basis of Hatfield, the district court ruled that the evidence of the ski mask was admissible.
On appeal, Murphy first argues that the district court erred because Hatfield is distinguishable. He contends that the burglary tools in Hatfield, which included lock picks and police scanners, were strongly connected to illegal conduct. In contrast, he argues that a ski mask could have a perfectly innocent explanation.
Defendant’s proposed distinction has no basis either in the analysis of Hatfield or in the facts of this ease. The Hatfield court in no way limited its'holding to burglary tools. Moreover, if the ski mask in this case does not suggest other illegal conduct, Rule 404(b) would not come into play. It is only because of the possible implication of other illegal conduct that the ski mask may be excludable under Rule 404(b).
Second, defendant argues that, unlike the defendant in Hatfield, he has never contended that he was unaware of the presence of the weapon. Instead, he claims that he defended solely on the ground that he- was not the person driving the ear and therefore had *-377 no part in the constructive possession of the weapon. As this court explained in Johnson, 27 F.3d at 1192, intent is not placed in issue simply because a defendant denies having committed the underlying offense. Instead, 404(b) evidence may be introduced only where defendant expressly places his intent or knowledge in issue, as in Hatfield, or when the crime itself requires “specific intent, separate and apart from underlying prohibited conduct, is made an element of the crime charged.” Id. “Knowledge is a ‘material issue’ when the defendant claims he was unaware that he was committing a criminal act.” Id. at 1194.
We reject Murphy’s assertions that he did not place his knowledge or intent in issue. In opening statements to the jury, defense counsel argued:
I think that a jigsaw puzzle is a very good analogy to how this case is going to be put together, but just as all of us have probably experienced, putting together a jigsaw puzzle, if just one piece is missing, then the picture is not complete. And the pieces can be analogized to the elements that are necessary to prove that Mr. Murphy is guilty. If just one element is missing, for instance, whether he knowingly possessed a weapon, whether he knew it was there, ... then you will have to acquit Mr. Mur-pby.
Trial Transcript, Vol. 1, p. 36 (emphasis added). Counsel clearly suggested that, even if the jury were to conclude that Murphy had been driving the car, they had to decide whether he knowingly possessed the weapon. Because the presence of the ski mask tended to prove that the weapon was in the car for an illegal purpose, it tended to prove that Murphy knew the gun was present and intended to use it. See Hatfield, 815 F.2d at 1072. The ski mask therefore was admitted for a lawful purpose.
In addition, the possibility of unfair prejudice in this ease was small. The charge of being a felon in possession of a firearm is an offense that is particularly unlikely to be affected by the admission of evidence that could imply defendant intended some other crime. If the jury were to believe that the defendant were the driver of the LTD, it would be difficult if not impossible to believe that he did not possess the firearm. This is not a circumstance where the jury would be inclined to convict a person of a wholly different crime simply because of the inflammatory nature of uncharged conduct. Instead, evidence of the ski mask potentially would suggest that defendant intended to commit some other offense only if the jury already had concluded that the weapon was in defendant’s possession. Thus, the potential for prejudice was very slight.
Finally, in light of the other evidence against defendant, even if admission of the ski mask constituted error, it would be harmless error. See, e.g., United States v. Co-wart, 90 F.3d 154, 157-58 (6th Cir.1996); Johnson, 27 F.3d at 1194 (concluding that erroneous admission of evidence under Fed. R.Evid. 404(b) was harmless error). Defendant was identified as the driver of the vehicle by two police officers; he admitted to police officers that he had been driving the vehicle; he was the person who reported to his mother that the car was “stolen” at about the time the driver had successfully eluded police; he and his mother were the only two people with knowledge where his mother’s gun was stored; and he volunteered information about the gun at a time when he would have had no reason to know a gun was involved.
In light of the overall evidence against defendant and the small potential for prejudice in the ease, the admission of the evidence of the ski mask, even if error, would be harmless.
D. Sufficiency of the Evidence of Possession
Appellant contends that there was insufficient evidence to find that he knowingly possessed the firearm. In order to prove that a defendant knowingly possessed an object, the government must demonstrate that the defendant had control over the object, either actually or constructively. United States v. Craven, 478 F.2d 1329, 1333 (6th Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973). If the weapon is not actually possessed, that is within the *-376 immediate power or control of the individual, the government must demonstrate that the person has “the power and intention at a given time to exercise dominion and control over an object_” Id. See also United States v. Critton, 43 F.3d 1089, 1096 (6th Cir.), cert. denied, — U.S.—, 115 S.Ct. 1987, 131. L.Ed.2d 873 (1995). Both actual and constructive possession may be proved by circumstantial evidence. Craven, 478 F.2d at 1333.
There is ample evidence of possession in this case. The driver was the only person in the vehicle and Murphy was identified as the driver. The weapon was found on the seat immediately next to where the driver had been sitting. Murphy and his mother were the only persons who knew where the gun was kept. Finally, Murphy’s unsolicited disclaimer of-the weapon strongly suggests that he knowingly possessed the gun. The evidence is more than sufficient to support the jury’s finding that Murphy knowingly possessed the firearm.
E. Armed Career Criminal
Appellant was sentenced as an armed career criminal pursuant to 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4. The armed career criminal statute provides in relevant part:
In the case of a person who violates section 922(g) of this title [felon in possession] and has three previous convictions by any court ... for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be ... imprisoned not less than fifteen years....
18 U.S.C. 924(e) (emphasis added). In other words, in order to be sentenced as an armed career criminal, a defendant who is convicted as a felon in possession of a firearm must previously have been convicted of three serious drug offenses or violent felonies, which themselves were “committed on occasions different from one another.” United States v. Brady, 988 F.2d 664 (6th Cir.), cert. denied, 510 U.S. 857, 114 S.Ct. 166, 126 L.Ed.2d 126 (1993).
At sentencing, defendant contended that two of the three convictions for which he was sentenced as an armed career criminal involved a single occasion of criminal conduct. Defendant was convicted of two armed robberies resulting from robberies of two residences in a duplex. Specifically, defendant and two accomplices entered the first residence and robbed the occupant. While defendant remained in the first residence to prevent the occupant from calling the police, his accomplices kicked in the door of the adjoining residence and robbed the second victim.
The district court concluded that, because the two apartments were separate domiciles, not just different rooms off a common area, the convictions resulted from conduct occurring on separate occasions. Since determining whether the conduct was a single occasion or multiple occasions presents a legal question concerning the interpretation of a statute, we review the district court’s decision de novo. United States v. Graves, 60 F.3d 1183, 185 (6th Cir.1995).
It is clear from the history of the statute that Congress specifically intended to target recidivists with § 924(e). Graves, 60 F.3d at 1185. When Congress originally enacted § 924(e)(1), the phrase “committed on occasions different from one another” was not included. See id. at 1186. Interpreting the predecessor statute, the Eighth Circuit held that a defendant could be convicted as an armed career criminal on the basis of six prior convictions for robbery arising out of the simultaneous robbery of six individuals. United States v. Petty, 798 F.2d 1157 (8th Cir.1986), vacated and remanded, 481 U.S. 1034, 107 S.Ct. 1968, 95 L.Ed.2d 810, reversed on remand, 828 F.2d 2 (8th Cir.1987), cert. denied, 486 U.S. 1057, 108 S.Ct. 2827, 100 L.Ed.2d 928 (1988). The Eighth Circuit reasoned that, because Petty could have been prosecuted under separate indictments for each count, the convictions satisfied the statutory requisite. After certiorari had been granted, the Solicitor General conceded that Congress had intended to enhance punishment for multiple criminal episodes that were distinct in time, as opposed to multiple convictions arising out of a single criminal episode. Graves, 60 F.3d at 1186.
*-375 Following the Petty ease, Congress amended the statute to require predicate offenses to have occurred “on occasions different from one another.” This circuit has held that by requiring predicate offenses to be committed on different occasions, Congress intended to provide enhanced punishment for multiple criminal episodes that were distinct in time. See United States v. Brady, 988 F.2d 664 (6th Cir.1993) (en banc). We have defined an “episode” as
an incident that is part of a series, but forms a separate unit within the whole. Although related to the entire course of events, an episode is a punctuated occurrence with a limited duration.
See, United States v. Brady, 988 F.2d 664 (6th Cir.1993) (en banc) (quoting United States v. Hughes, 924 F.2d 1354, 1361 (6th Cir.1991)).
This circuit has declined to hold that criminal episodes need be separated by any significant period of time. In Brady, 988 F.2d 664, the defendant was convicted of two robberies of two separate retail shops. The first involved robbery of several people in a beauty shop. Thirty minutes later, the defendant and his accomplice went to a bar, where they subsequently robbed the patrons. The en bane court held that the robberies of the beauty parlor and bar were different felonies for purposes of the statute, despite the fact that the crimes were separated by only a short period of time. The court held that because the offenses in Brady involved crimes committed by a defendant “at different times and places and against different victims, ...” the offenses were separate for purposes of § 924(e).
In reaching our decision in Brady, we reviewed a series of cases from other circuits in which the courts had rejected a defendant’s claim that a crime spree should be considered a single criminal episode rather than a series of episodes. See United States v. Schieman, 894 F.2d 909, 913 (7th Cir.), cert. denied, 498 U.S. 856, 111 S.Ct. 155, 112 L.Ed.2d 121 (1990); United States v. Tisdale, 921 F.2d 1095, 1099 (10th Cir.1990), cert. denied, 502 U.S. 986, 112 S.Ct. 596, 116 L.Ed.2d 619 (1991); United States v. Washington, 898 F.2d 439, 441-42 (5th Cir.), cert. denied, 498 U.S. 842, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990). We remarked that the cited courts had relied upon the fact that the first incident was “complete” or committed “successfully” before the second crime was started. For example, in discussing Schie-man, we specifically observed that the Seventh Circuit has
weighed more heavily the facts that the defendant had successfully completed his burglary and had. safely escaped from the premises, thus concluding the burglary episode before he undertook an assault on the officer investigating the case.
Brady, 988 F.2d at 668. See also Schieman, 894 F.2d at 913 (“Once the original crime is complete, there is no principled way to distinguish between an attack in response to an investigation commenced within ten minutes of the burglary and an attack in response to an investigation commenced a day after the burglary.”). These observations were consistent with this court’s earlier definition of an “episode” as a “punctuated occurrence of limited duration” and as “a separate unit within the whole.” Hughes, 924 F.2d at 1361.
More recently we have faced a situation in which a defendant was convicted both of burglary and of assault on a police officer. Graves, 60 F.3d at 1187. In Graves, the defendant burglarized a home. As he was leaving a woods near the home he was confronted by a police officer. He ran back into the woods and fired three shots at the pursuing officer. This court held that, while it need not decide whether the defendant had “successfully completed” the burglary before committing the assault, the entire circumstance required the court to conclude that the assault was part of the same criminal episode. In particular, the court relied upon the fact that the defendant had not yet left the location of the first offense and that the assault occurred within moments of the burglary.
In concluding that defendant’s conduct involved only one criminal episode, the Graves panel relied upon United States v. Sweeting, 933 F.2d 962 (11th Cir.1991). In Sweeting, the defendant was burglarizing a home when the police appeared. He fled into another home and hid in the closet. The Eleventh *-374 Circuit held that the defendant had engaged in only one criminal episode.
Our review of these cases leads us to conclude that defendant Murphy engaged in only one criminal episode in this case, despite the robbery of two separate residences. Because Congress intended to punish recidivists, the predicate conduct must amount to separate and distinct transactions in some definable sense. In the instant ease, there exists no principled way of distinguishing between the end of the first burglary and the beginning of the second. Murphy himself was only guilty of the second burglary as an aider and abettor. Because he never left the first location, he did not “successfully complete” the first burglary until his accomplices completed the second. We are unable to define the first robbery as a “separate unit within the whole” of Murphy’s criminal conduct. Hughes, 924 F.2d at 1361. We do not believe that the question of whether the conduct constitutes a distinct criminal episode can turn on the legal technicality of whether the domiciles were separate residences or merely different rooms off a common area. These distinctions have not formed the basis for our reasoning in earlier cases. See Brady, 988 F.2d at 669. Nor can the question turn on whether the conduct involved separate victims, because that distinction would be contrary to the Petty decision and the subsequent amendment of the statute. Instead, the question of separateness must turn on some reasoned basis for considering criminal conduct to be a definable event.
Indeed, it is the absence of a definable endpoint to the first event that distinguishes this case ficom our decision in United States v. Wilson, 27 F.3d 1126, 1131 (6th Cir.1994). In Wilson, the defendant was convicted of two counts of criminal sexual conduct arising out of offenses committed on the same day against different victims on different floors and rooms within the same house. The defendant in Wilson completed one sexual assault and then elected to seek out another victim in another location after completing the first crime and leaving the first location.
Here, in contrast, Murphy never left his original location, he never ceased his original conduct and he never successfully escaped the site of the first crime until the second was complete. These facts bring the case much closer to the facts of Graves and Sweet-ing than to Brady or Wilson.
The government argues that, because, the district court separately indicted Murphy for the two burglaries and the cases were never consolidated, we should defer to the state court’s determination that these were separate events. The state court, however, was never asked to define whether the conduct was separate under the armed career criminal statute, nor would its interpretation of a federal criminal statute'be entitled to deference. Moreover, to adopt the government’s reasoning would be to abandon our central understanding of the statute — that it is the nature of the criminal episodes themselves, not the status or timing of the convictions, that controls whether the events are separable. See Brady, 988 F.2d at 667 (collecting numerous decisions holding that timing of convictions, including simultaneity of convictions, is not relevant under the statute).
Accordingly, we hold that defendant’s convictions for robberies of two sides of a duplex constituted a single criminal episode for purposes of defining predicate offenses for an enhanced sentence as an armed career criminal under 18 U.S.C. § 924(e). As a result, defendant stands convicted of only two predicate felonies under § 924(e). His sentence therefore was improperly enhanced under § 924(e) and U.S.S.G. § 4B1.4.
F. Constitutionality of 18 U.S.C. § 922(g)
Murphy was convicted of being a felon in possession of a firearm and of ammunition, constituting two violations of 18 U.S.C. § 922(g). Section 922(g)(1) provides in relevant part:
It shall be unlawful for any person ... who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been *-373 shipped or transported in interstate or foreign commerce.
Murphy claims that § 922(g)(1) is unconstitutional following the Supreme Court’s decision in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In Lopez, the Supreme Court concluded that 18 U.S.C. § 922(q) [possession of a firearm in a school zone] was unconstitutional because it lacked a sufficient connection to interstate commerce and therefore exceeded the proper scope of Congress’ authority to regulate under the Commerce Clause. See U.S. Const. art. I, § 8, el. 3.
In the wake of the Lopez decision, courts across the country have been faced with repeated challenges to a variety of statutes, all of which are alleged to exceed congressional authority under the Commerce Clause. Section 922(g)(1) has been the subject of a barrage of such challenges.
Since the filing of Murphy’s appeal, this court has upheld the constitutionality of § 922(g)(1) in the aftermath of Lopez. See United States v. Turner, 77 F.3d 887, 889 (6th Cir.1996) (“[Section] 922(g)(1) represents a valid exercise of legislative power under the Commerce Clause.”); United States v. Chesney, 86 F.3d 564, 568 (6th Cir.1996) (same). Accordingly, pursuant to the prior decisions of this court, we reject Murphy’s facial challenge to § 922(g)(1).
Murphy, however, also challenges § 922(g)(1) as applied to him. He argues that the government failed to prove a sufficient nexus between the particular handgun at issue in this case and interstate commerce.
At trial, the government introduced evidence by a firearms expert, who testified that the handgun was manufactured in Miami, Florida, and the ammunition was manufactured in Alton, Illinois. Murphy’s mother testified that she purchased the handgun at a pawn shop in Memphis. Murphy contends that such evidence is insufficient to demonstrate an interstate commerce connection.
We disagree. In Scarborough v. United States, 431 U.S. 563, 566-67, 97 S.Ct. 1963, 1964-65, 52 L.Ed.2d 582 (1977), the Supreme Court held that, under the predecessor to § 922(g)(1), the government was required to prove only a minimal nexus between the firearm and interstate commerce. The Court held that proof that a firearm had moved in interstate commerce at any time was sufficient to meet the government’s burden of demonstrating the “in commerce or affecting commerce” element of the statute.
This court recently has concluded that the Lopez decision did not disturb Scarborough and other
Supreme Court’s precedents which indicate that a firearm that has been transported at any time in interstate commerce has a sufficient effect on interstate commerce to allow Congress to regulate the possession of that firearm pursuant to its Commerce Clause powers.
Chesney, 86 F.3d at 570-71. The Chesney panel therefore concluded that, because Chesney stipulated that the firearm had at one time traveled in interstate commerce, the minimal nexus test was met.
In the instant case, Murphy never stipulated that the firearm previously had moved in interstate commerce. Instead, the-proof showed that Delores Murphy bought a gun manufactured in another state in a local pawn shop. Murphy therefore contends that, while the government’s evidence was sufficient to prove that the handgun at some time traveled across state lines, it failed to prove that the movement occurred during any commercial transaction. In other words, while the government may have proved an interstate connection, it failed to prove an interstate commerce connection, as required by the statute and the Constitution.
However, in repeated decisions preceding Lopez, this court has held that, under the Scarborough minimal nexus test, “proof that a firearm was manufactured outside the state in which the possession occurred is sufficient to support a finding that the possession was in or affected interstate commerce.” United States v. Vincent, 20 F.3d 229, 236 (6th Cir. 1994). See also United States v. Fish, 928 F.2d 185, 186 (6th Cir.), cert. denied, 502 U.S. 834, 112 S.Ct. 115, 116 L.Ed.2d 84 (1991); United States v. Singleton, 902 F.2d 471, 473 (6th Cir.1990); United States v. Pedigo, 879 F.2d 1315 (6th Cir.1989); United States v. *-372 Jones, 538 F.2d 1387, 1393 (6th Cir.1976), cert. denied, 431 U.S. 964, 97 S.Ct. 2919, 53 L.Ed.2d 1059 (1977). Cf. United States v. Hill, 248 U.S. 420, 424, 39 S.Ct. 143, 144, 63 L.Ed. 337 (1919) (“The transportation of one’s own goods from State to State is interstate commerce, and, as such, subject to the regulatory power of Congress.”). Inasmuch as Chesney has determined that the Lopez decision did not disturb the minimal nexus test of Scarborough, there exists no principled basis to reexamine earlier holdings of this court applying that test.
Accordingly, because the government proved that the firearm was manufactured in a state other than the one in which it was possessed, the government met its burden of proving a connection to interstate commerce.
III.
In summary, we affirm appellant’s convictions under 18 U.S.C. § 922(g)(1). However, because we conclude that defendant previously was convicted of only two, rather than three, violent felonies, he is not subject to enhancement of his sentence as an armed career criminal under 18 U.S.C. § 924(e) and U.S.S.G. § 4B1.4. We therefore remand the case to the district court for resentencing in accordance with this opinion.