**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0203n.06

No. 16-1970

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 05, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| LIVERTIS RILEY | ) | |
| a.k.a. LEVERTIS RILEY, | ) | |
| | ) | **OPINION** |
| **Defendant-Appellant.** | ) | |
| | ) | |

Before: DAUGHTREY, MOORE, and GIBBONS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Livertis Riley, also known as Levertis Riley, appeals his convictions after a jury trial for counts of unlawful possession of firearms and ammunition by a felon, in violation of 18 U.S.C. § 922(g). Riley makes six claims of error. First, Riley challenges the district court's failure to grant his motion to suppress. Second, Riley claims that the trial court allowed prejudicial and inadmissible rebuttal evidence to be presented at trial. Third, Riley challenges the sufficiency of evidence supporting his conviction. Fourth, Riley argues that he is entitled to a new trial on the basis of newly discovered evidence. Fifth, he claims that his sentence is procedurally unreasonable. Finally, he argues that the cumulative effect of these errors amounts to a denial of due process. We **VACATE** the sentence and **REMAND** for resentencing consistent with this opinion. We **AFFIRM** in all other respects.

## I. BACKGROUND

In October 2014, the FBI Violent Crime Task Force ("VCTF"), a Detroit-based unit composed of police officers and FBI agents, became aware of an outstanding arrest warrant for Riley out of the state of West Virginia. R. 115 (Jan. 6, 2016 Trial Tr. at 6, 27) (Page ID #830, 851). The warrant was related to an alleged armed robbery of a residence. R. 116 (Jan. 7, 2016 Trial Tr. at 15) (Page ID #955). Upon learning of the warrant, Agent Matt Krupa ran a database check and obtained a copy of Riley's photograph from his driver's license. R. 115 (Jan. 6, 2016 Trial Tr. at 55–56) (Page ID #879–80). Krupa also found two Detroit addresses associated with Riley: 3920 Buckingham and 15420 Sussex. *Id.* at 56 (Page ID #880). Each house is roughly a thirty-minute drive away from the other. *Id.* at 59 (Page ID #883).

On October 14, 2014, Krupa and Officer Robert George drove to the Buckingham address. *Id.* at 56–57 (Page ID #880–81). Krupa testified that the Buckingham house appeared unoccupied; he observed that there was no furniture in the front family room and there was a "for rent" sign at the front of the house. *Id.* at 58 (Page ID #882).

Krupa and George then drove to the Sussex house. *Id.* at 60 (Page ID #884). There, Krupa observed several people standing on the front porch, including Riley. *Id.* Krupa also observed a blue GMC Yukon parked in the driveway, and discovered that the car was registered to Riley at the Buckingham address. *Id.* at 62 (Page ID #886). Krupa and George, along with other members of the VCTF, surveilled the Sussex house for three hours until it began raining and they lost visibility. *Id.* at 62–63 (Page ID #886–87). The GMC Yukon remained parked outside the house during the entire three hours. *Id.* at 63 (Page ID #887). When the VCTF

surveillance team returned the next day, they again observed the GMC Yukon, and saw Riley coming in and out. *Id.* at 64 (Page ID #888). The VCTF team observed Riley and his co-defendant, Michael Murray, loading furniture and boxes into the GMC Yukon. *Id.* at 35–36 (Page ID #859–60). Eventually, defendant's mother, Deidre Lucas, got in the GMC Yukon and drove away. Although the VCTF team initially planned to arrest Riley by initiating a traffic stop, after several hours of surveillance, Riley had not left the Sussex house. *Id.* at 65 (Page ID #889). The VCTF team therefore obtained a search warrant to enter the house. *Id.*

The VCTF team surrounded the house before knocking and shouting, "Police! Search Warrant!" *Id.* at 66–67 (Page ID #890–91). They heard no response. *Id.* at 68 (Page ID #892). The team then breached the front exterior and interior doors with a battering ram. *Id.* at 68–69 (Page ID #892–93). A "very aggressive" pit bull came to the front and was shot by an agent. *Id.* at 69 (Page ID #893). They encountered two more dogs in the kitchen, and another in a bedroom, which they were able to restrain. *Id.* at 72–74 (Page ID #896–98). The VCTF team continued to shout "Police! Search Warrant!" and ordered any occupants to come out, but they heard no response. *Id.* at 69–70 (Page ID #893–94).

The agents finally came to a bedroom door on the northeast corner of the first floor of the house and found it locked. *Id.* at 75 (Page ID #899). Co-defendant Murray spoke through the door, and asked what they wanted. *Id.* at 77 (Page ID #901). Agent Krupa identified himself, and again announced that they had a search warrant and told them to come out of the room. *Id.* Murray identified himself and asked why they shot his dog. *Id.* Krupa and Murray then spoke through the door for "[s]everal minutes." *Id.* at 79 (Page ID #903). Eventually, Riley also

identified himself and said that this was his mother's house. *Id.* Krupa asked Riley if there were any drugs in the house, and Riley said that there were none. *Id.* at 80 (Page ID #904). Krupa also asked if there were any guns in the house, and Riley said that "there might be a gun in here." *Id.* Krupa then said they needed to surrender, and asked if there was a gun in the room with them, but did not get a response. *Id.* After "[a] few minutes" of silence, one of the officers informed Krupa that Riley and Murray said they were coming out of the room. *Id.* at 81 (Page ID #905). Krupa warned them not to come out with any guns, and then heard movement in the room, including a loud noise that "sounded to [him] like something was dropping on the ground." *Id.* Murray and Riley then emerged from the room unarmed and were taken into custody. *Id.* at 82 (Page ID #906).

The VCTF team then searched the room that Riley and Murray emerged from, and found a rifle and a magazine under a mattress on the floor. *Id*. at 85 (Page ID #909); R. 116 (Jan. 7, 2016 Trial Tr. at 23–24) (Page ID #963–64). Based on their discovery, they obtained a search warrant to search the entire house. R. 115 (Jan. 6, 2016 Trial Tr. at 85) (Page ID #909). They found six firearms, including two handguns, three assault rifles, and a machine gun, as well as ammunition and magazines in the bedroom where Riley and Murray had hidden. *Id.*; R. 116 (Jan. 7, 2016 Trial Tr. at 38–39) (Page ID #978–79). They also found bags that contained papers that appeared to belong to Riley, including Christmas and birthday cards and government paperwork. R. 85 (Jan. 13, 2016 Trial Tr. at 91) (Page ID #517).

A grand jury indicted Riley and Murray for being felons in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g). R. 14 (Indictment at 1–2) (Page ID #20–21).

Murray pleaded guilty, and in October 2015 he was sentenced to thirty-seven months in custody. R. 85 (Jan. 13, 2016 Trial Tr. at 11) (Page ID #437). Shortly thereafter, Murray agreed to cooperate with authorities and testify against Riley. *Id.* at 11–13 (Page ID #437–39).

Prior to trial, Riley moved to suppress his statement to Krupa in the Sussex house, when he said that there "may be a gun in here." R. 39 (Mot. to Suppress) (Page ID #121–36). Riley argued that although he was in a home, he was not free to leave, and that this interrogation took place without proper *Miranda* warnings. *Id.* at 3 (Page ID #123). The district court denied the motion, and held that Riley was neither in custody nor subject to interrogation, and that the public-safety exception to *Miranda* applied. R. 54 (Order Denying Mot. to Suppress at 3) (Page ID #242).

At trial, Murray testified that at the time of the arrest, Riley was living at the Sussex address with his mother because Riley was afraid that the police would search for him at his Buckingham address after the armed robbery in West Virginia. R. 85 (Jan. 13, 2016 Trial Tr. at 17–18) (Page ID #443–44). Murray stated that he began living with Riley and his mother at the Sussex house after Murray was released from prison, and that when he arrived, the guns in question were already in the house. *Id.* at 18–19 (Page ID #444–45). Murray testified that on the day of the arrest, Riley pushed Murray into the bedroom when he heard the police enter. *Id.* at 24 (Page ID #450). He said that Riley picked up an AR-15, which he pointed at the bedroom door, handed Murray a gun, and said he was "not going back to jail." *Id.* at 25, 28 (Page ID #451, 454).

Riley's counsel argued that the guns belonged to Murray, not Riley, and that Murray had been staying at the Sussex house with the permission of Riley's mother. R. 115 (Jan. 6, 2016 Trial Tr. at 19, 23) (Page ID #843, 847). They argued that Riley's mother was in the process of moving out of the Sussex house, and that Riley lived at the house on Buckingham. *Id.* at 17–20 (Page ID #841–44). Riley called four witnesses, including his mother, who testified that Riley did not live on Sussex. The government later called a rebuttal witness, John Jones, who was not listed on the government's witness list. R. 85 (Jan. 13, 2016 Trial Tr. at 167) (Page ID #593). Jones testified that he purchased 3920 Buckingham in June 2014, months before the arrest took place, and that at the time he purchased the property it appeared abandoned, that "you couldn't reside in that property," and that he observed "grass . . . growing up to your chest." *Id.* at 167–69 (Page ID #593–95). He stated that after he had rehabilitated the property, his first tenant began living in the house in November 2014. *Id.* at 170 (Page ID #596).

After a six-day trial, a jury convicted Riley of one count of illegally possessing firearms and one count of illegally possessing ammunition, both as a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1). The district court determined Riley's total offense level was 28 and his criminal history level was II, found the guidelines range to be 87 to 108 months, and sentenced Riley to 90 months of imprisonment. R. 112 (Cont'd Sentencing Hr'g Tr. at 12–13) (Page ID #775–76). Riley moved for a new trial based on newly discovered evidence. R. 103 (Mot. for New Trial) (Page ID #712–17). The district court found that the evidence was not material and denied the motion. R. 111 (Order Denying Mot. for New Trial) (Page ID #758–63). Riley timely appealed.

## II. ANALYSIS

### A. Motion to Suppress

Riley argues on appeal that the district court erred in denying his motion to suppress statements made in violation of *Miranda*. Riley contends that, when he admitted to Krupa that there might be a gun in the Sussex house, he was subject to a custodial interrogation, and that the statement was therefore inadmissible absent the proper *Miranda* warnings. The government responds that Riley's statement, made during an armed standoff with the police, was not made while he was in custody or subject to interrogation. In the alternative, the government also argues that the public-safety exception nonetheless applies.

#### 1. Standard of Review

We review the denial of a motion to suppress for clear error as to factual findings and de novo as to conclusions of law. *United States v. Brown*, 732 F.3d 569, 572 (6th Cir. 2013). We view the evidence "in the light most likely to support the district court's decision." *United States v. Garcia*, 496 F.3d 495, 502 (6th Cir. 2007) (citation omitted).

#### 2. Public-Safety Exception

In *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966), the Supreme Court held that an individual subject to custodial interrogation by the authorities must be notified of his right against self-incrimination. Statements made in the absence of *Miranda* warnings are inadmissible at trial. *Id.* at 479. In order for the rule to apply, the individual must be in custody *and* subject to interrogation. *United States v. Crowder*, 62 F.3d 782, 785 (6th Cir. 1995).

7

We need not decide whether Riley was "in custody" for the purposes of *Miranda*, however, because the public-safety exception clearly applies. The public-safety exception applies "when officers have a reasonable belief based on articulable facts that they are in danger." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). "For an officer to have a reasonable belief that he is in danger," and thus for the exception to apply, "he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007). Where applicable, the public-safety exception permits police officers and agents to ask "questions necessary to secure their own safety or the safety of the public" as opposed to "questions designed solely to elicit testimonial evidence from a suspect." *New York v. Quarles*, 467 U.S. 649, 659 (1984).

Here, the VCTF team was executing an arrest warrant related to an armed robbery allegedly committed by Riley in West Virginia. Under the circumstances, it was reasonable for officers to believe that Riley might have firearms. *See United States v. Williams*, 272 F. App'x 473, 477 (6th Cir. 2008) (holding that "the police officers plainly had a reasonable belief that [defendant] might possess a weapon" because his "criminal history . . . suggested not only that he possessed weapons, but also that he was willing to use force, as evidenced by his aggravated robbery conviction and his arrest for discharging a weapon into a home or school"). It was also reasonable for the VCTF team to believe that someone other than the police might gain access to a weapon and inflict harm with it. Riley and Murray were hiding behind a door, and they were not visible to Krupa at the time of questioning. Riley could have had, and indeed did have,

8

multiple weapons behind that door with which to inflict harm. Given their initial refusal to come out and surrender to the police, it was reasonable for Krupa and others to fear for their safety and the safety of the public. The district court properly denied defendant's motion to suppress on the basis of the public-safety exemption.

## B. Rebuttal Witness Testimony

Riley next claims that the district court abused its discretion in allowing the testimony of rebuttal witness John Jones, who was not listed on the government's witness list. Jones, the owner of the house on Buckingham where Riley claimed he lived, testified as to the abandoned state of the property when Jones purchased the Buckingham house months prior to the arrest, and verified that no one lived on the property until November 2014, a month after the arrest. We review a district court's decision to admit rebuttal witnesses for abuse of discretion. *United States v. Rayborn*, 495 F.3d 328, 343 (6th Cir. 2007).

Riley's contention is that "[r]ebuttal testimony is properly admitted to 'rebut *new* evidence or *new* theories proffered in the defendant's case-in-chief,'" and that the district court abused its discretion by admitting rebuttal testimony for the sole purpose of verifying Riley's address when the government knew that Riley's address was at issue. Appellant's Br. at 33, 37 (quoting *United States v. Caraway*, 411 F.3d 679, 683 (6th Cir. 2005)). The government responds that it did not know that it would need to call Jones as a witness until Riley presented four witnesses who testified that Riley lived at the Buckingham residence, making Jones's rebuttal testimony regarding that residence relevant. Although a district court *may* limit the scope of rebuttal testimony to rebut new evidence or theories, "it is not required to do so and it is

not an abuse of discretion not to impose such a limit." *Rayborn*, 495 F.3d at 344. The district court did not abuse its discretion here in allowing Jones to testify as a rebuttal witness.

## C. Sufficient Evidence

Riley also claims that there was insufficient evidence to support his conviction, and that the district court therefore erred in denying his motion for judgment of acquittal notwithstanding the verdict. *See* R. 81 (Mot. for Judgment of Acquittal) (Page ID #405–12); R. 86 (Order Denying Mot. for Judgment of Acquittal) (Page ID #604–06). "[W]e review his motion de novo" and view "the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008). We draw all reasonable inferences and credibility findings in favor of the verdict. *Id.*

Riley was convicted of possessing firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). In order to convict a defendant under 18 U.S.C. § 922(g)(1), the government must prove three elements: (1) the defendant had a prior felony conviction; (2) he knowingly possessed a firearm; and (3) the firearm traveled in interstate commerce. *United States v. Nelson*, 725 F.3d 615, 619 (6th Cir. 2013). Riley has stipulated that he had a prior conviction and that the firearms at issue traveled in interstate commerce. R. 115 (Jan. 6, 2016 Trial Tr. at 50–52) (Page ID #874–76). We must therefore ask whether any rational trier of fact could have found beyond a reasonable doubt that Riley knowingly possessed these firearms.

Possession may be "actual" or "constructive," and can be proved by circumstantial evidence. *United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013). Actual possession means

that the firearm "is within the immediate power or control of the individual." *Id.* (quoting *United States v. Murphy*, 107 F.3d 1199, 1207–08 (6th Cir. 1997)). Constructive possession means the defendant "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Id.* (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)).

Six firearms were found in the house on Sussex where Riley and Murray were arrested, along with ammunition and magazines. Although Riley claims he did not live at the address where the firearms were found, Murray testified that Riley did live at that address, that Riley possessed a Glock handgun, that Riley had barricaded both of them in the bedroom upon hearing the police arrive, and that all the firearms found by the police were at the address when Murray began living there. Agents also found other items in the house that appeared to belong to Riley, including Christmas and birthday cards and government paperwork. When agents initially conducted a database search for Riley prior to the arrest, the Sussex address was listed as one of the several residences associated with Riley. Finally, when Krupa asked if there were any weapons in the home, Riley answered that there "might be some" in the room with him. There is clearly ample evidence to support the verdict in this case.

Riley argues that the government's case rested "almost entirely" on the testimony of Murray, who he claims is not credible. Appellant's Br. at 39. Riley relies on the same arguments raised at trial as to Murray's credibility, namely, that Murray originally told his lawyer that the firearms were his and that Murray entered into a plea agreement and decided to testify in exchange for a reduced sentence. R. 85 (Jan. 13, 2016 Trial Tr. at 11–13, 52) (Page ID

#437–39, 478).  We find no reason on appeal to diverge from the jury's credibility determination as to Murray, particularly given the evidence weighing against Riley's defense that he lived at the Buckingham address.  We hold that there was sufficient evidence for the jury to find that Riley possessed the firearms and ammunition in question.

## D.  Motion for New Trial

Prior to sentencing, Riley filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, and argued that newly discovered material evidence called into question Murray's credibility.  R. 103 (Mot. for New Trial at 5) (Page ID #716).  Specifically, there was a question both during and after trial about whether a certain Glock pistol seized during the arrest was a stolen firearm.  *Id.* at 2 (Page ID #713).  Murray had previously testified that he had seen Riley with the pistol and that "[Riley's] brother brought the . . . handgun back from West [V]irginia" around July or August of 2012.  *Id.*  Because the status of the pistol was relevant to sentencing, a federal agent interviewed the purported owner of the pistol after the conclusion of trial, who stated that she purchased the pistol in May 2012 in West Virginia, but did not discover it had gone missing until October 2015.  *Id.* at 3 (Page ID #714).  The district court denied Riley's motion for a new trial and held that the new evidence in question was not material or likely to produce an acquittal.  R. 111 (Order Denying Mot. for New Trial at 5) (Page ID #762).

We review a ruling on a motion for a new trial for abuse of discretion.  *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001).  No such abuse occurred here.  The newly discovered evidence did not call into question Murray's testimony, let alone contradict it.  Rather, the interview with the owner of the pistol corroborates Murray's version of where the pistol was

obtained, and the timing of when it might have been obtained. Because the newly discovered evidence was immaterial and unlikely to produce an acquittal, we affirm the district court's denial of Riley's motion for a new trial.

## E. Sentencing

In addition to challenging the district court's evidentiary rulings, Riley challenges his sentence as procedurally unreasonable. Appellant's Br. at 44. The district court found Riley's guidelines range to be 87 to 108 months based on a total offense level of 28 and a criminal history level of II and sentenced Riley to 90 months in custody. R. 112 (Cont'd Sentencing Hr'g Tr. at 12–13) (Page ID #775–76). Riley argues that the district court erred in applying sentencing enhancements without sufficient evidence, in imposing a sentence in disparity with his co-defendant's sentence, and in imposing a sentence that overrepresented his prior criminal record.

We apply an abuse-of-discretion standard in reviewing a sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007). Significant procedural error could include "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.*

### 1. Stolen firearm enhancement

The district court imposed a two-level enhancement of Riley's total offense level under USSG § 2K2.1(b)(4), because at least one of the firearms was stolen. R. 112 (Cont'd Sentencing Hr'g Tr. at 12) (Page ID #775). In order for this enhancement to apply, a defendant need not

have knowledge that the firearm was stolen. *See United States v. Murphy*, 96 F.3d 846, 848–49 (6th Cir. 1996).[1]

Here, an ATF trace report revealed that a Glock handgun found during Riley's arrest belonged to a woman in West Virginia, who later confirmed that the gun was missing. R. 99-2 (ATF Trace Report) (Page ID #689). The district court's application of this enhancement was supported by a preponderance of the evidence.

## 2. Obstruction of Justice enhancement

In addition to the stolen firearm enhancement, the district court imposed another two-level enhancement for obstruction of justice, because Riley had suborned perjury by calling witnesses, including his mother, to lie to the jury about where he lived. R. 112 (Cont'd Sentencing Hr'g Tr. at 12) (Page ID #775); USSG § 3C1.1. The Guidelines commentary notes that that the obstruction of justice enhancement applies to "committing, suborning, or attempting to suborn perjury." USSG § 3C1.1 cmt. n.4(B). The commentary also states that a defendant is accountable for his "own conduct and for conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." USSG § 3C1.1 cmt. n.9. "Perjury is defined as (1) a false statement under oath (2) concerning a material matter (3) with the willful

---

[1]Riley requests that we revisit our decision in *Murphy*, where we held that the lack of a scienter requirement in § 2K2.1(b)(4) did not violate due process. Riley presents no argument for why our prior published decision should not be upheld, and points only to *United States v. Handy*, 570 F. Supp. 2d 437 (E.D.N.Y. 2008), a district court decision that not only does not control in this circuit, but is apparently no longer good law in its own circuit. *See United States v. Thomas*, 628 F.3d 64, 68–69 (2d Cir. 2010) (upholding the validity of § 2K2.1(b)(4) and noting commentary observing that the enhancement is intended to apply regardless of knowledge that the firearm was stolen).

intent to provide false testimony." *United States v. Collins*, 799 F.3d 554, 593 (6th Cir. 2015) (internal quotation marks omitted). For an obstruction enhancement stemming from a defendant's own testimony, we have held that "the obstruction-of-justice enhancement applies only if the district court (1) identif[ies] those particular portions of defendant's testimony that it considers to be perjurious; and (2) either make[s] a specific finding for each element of perjury or, at least, make[s] a finding that encompasses all of the factual predicates for a finding of perjury." *Id.* at 593–94 (internal quotation marks omitted) (alterations in original); *see also United States v. Dunnigan*, 507 U.S. 87, 95 (1993). We enforce this requirement "[i]n order to minimize the danger that application of the [obstruction] guideline would discourage defendants from testifying truthfully at trial" and "to provide the appellate court with a meaningful record to determine that such an independent finding has been made." *United States v. Sassanelli*, 118 F.3d 495, 500–01 (6th Cir. 1997). "We have consistently and repeatedly vacated sentences imposing an obstruction of justice enhancement for failure to comply" with this requirement. *United States v. Paulette*, 457 F.3d 601, 607 (6th Cir. 2006). Although most frequently we are called on to enforce these requirements as to obstruction enhancements stemming from a defendant's own testimony, the purposes behind the requirements apply with equal force to allegedly perjurious testimony from witnesses. Whether we are dealing with testimony from a defendant or witness, it is necessary to minimize the danger of discouraging truthful testimony and to provide the appellate court with a meaningful record. *See Sassanelli*, 118 F.3d at 500–01.

The district court failed to satisfy these requirements. During the sentencing hearing, the district court noted that Riley's mother had been indicted for perjury. R. 112 (Cont'd Sentencing

Hr'g Tr. at 12) (Page ID #775); R. 99-4 (Indictment of Deidra Lucas) (Page ID #692–97). When reminded by the government, the district court agreed that the court relied on the portions of testimony identified in the indictment. R. 112 (Cont'd Sentencing Hr'g Tr. at 14) (Page ID #777). The court did not specify—or even necessarily indicate that it knew—what the indictment said. When asked, "Is the court relying upon that portion specifically identified in the indictment against Mrs. Lucas?" the court simply said, "the answer is yes to your question. Is that sufficient?" *Id.* Even if this exchange satisfies the requirement that the court identify particular portions of the testimony, it does not satisfy the requirement that the court "make[] a finding that encompasses all of the factual predicates for a finding of perjury" (i.e., falsity, materiality, and willfulness). *Collins*, 799 F.3d at 594. Therefore, the district court did not make the factual findings necessary to impose an enhancement for obstruction of justice for suborning perjury.

### 3. Disparity of Sentences and Overrepresentation of Criminal History

Riley objects to the disparity between the length of his sentence as compared with that of his co-defendant, Murray. Riley cites no cases or statutes in support of this argument, and we find that it is unpersuasive. Moreover, as the government points out, we have held that the § 3553(a)(6) factor requiring a district court to consider the need to avoid unwarranted sentencing disparities pertains to national disparities, but that "the district judge could but was not required to consider disparities between codefendants." *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008). Although Murray and Riley received very different sentences, there are a number of factors that influenced that outcome, including Murray's decision to enter into a

16

plea agreement and cooperate with the government, their relative criminal histories, and their relative culpability. In sum, we conclude that the district court did not err in imposing a longer sentence on Riley.

Riley also argues that his sentence overrepresents the seriousness of his criminal history, because his prior offenses were committed when he was only fifteen. In 2001, Riley was convicted as a juvenile for solicitation of murder, felony firearm, armed robbery, conspiracy to commit armed robbery, and conspiracy to assault with intent to murder. Riley claims that the district court should have departed downward pursuant to USSG § 4A1.3(b)(1) "based upon the age of the conviction" and his youth at the time. Appellant's Br. at 50.

"[W]e do not review a district court's decision not to depart downward unless the record shows that the district court was unaware of, or did not understand, its discretion to make such a departure." *United States v. Santillana*, 540 F.3d 428, 431 (6th Cir. 2008). At the sentencing hearing, Riley's counsel raised the same argument regarding the seriousness of Riley's criminal history before the district court. R. 112 (Cont'd Sentencing Hr'g Tr. at 7) (Page ID #770). The court stated its familiarity with that argument, *id.*, and rejected it, *id.* at 12 (Page ID #775). We therefore do not review the district court's decision not to depart downward.

## F. Cumulative Effect

Riley finally argues that the cumulative effect of the trial errors was so prejudicial that he is entitled to a new trial. We found no significant errors with regard to the claims raised above.

We also find unpersuasive Riley's argument that he was further prejudiced by interruptions made by the district court during voir dire and cross-examination. This argument

was not raised in the district court and so we review for plain error.  *See generally United States v. Olano*, 507 U.S. 725, 734 (1993).  It is well established that a district court has wide latitude in imposing reasonable limits on the scope of questioning.  *United States v. Beverly*, 369 F.3d 516, 535 (6th Cir. 2004).  The fifteen interruptions that occurred were made over the course over a six-day jury trial, and apparently served to limit the use of repetitive or irrelevant questions.  We cannot find plain error here.

### III.  CONCLUSION

Based on the foregoing, we **VACATE** the sentence and **REMAND** for resentencing consistent with this opinion.  We **AFFIRM** in all other respects.