STATE of Tennessee, Appellee,

v.

Scott Houston NIX, Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

Nov. 21, 1995.

Application for Permission to Appeal Denied by Supreme Court May 6, 1996.

Mark E. Stephens, District Public Defender, and Aubrey L. Davis, Assistant Public Defender, Knoxville, for Appellant.

Charles W. Burson, Attorney General of Tennessee, and Clinton J. Morgan, Assistant Attorney General of Tennessee, Nashville, Randall E. Nichols, District Attorney General, and Zane Scarlett, Assistant District Attorney General, Knoxville, for Appellee.

## *OPINION*

TIPTON, Judge.

The defendant, Scott Houston Nix, appeals as of right from his jury conviction in the Criminal Court of Knox County for attempted first degree murder, a Class A felony, especially aggravated robbery, a Class A felony, and aggravated robbery, a Class B felony. He was sentenced to thirty-five years as a Range II, multiple offender for the attempted first degree murder conviction to be served consecutively to sentences from which he was on parole at the time the present offenses were committed. He was sentenced to thirty-five years as a Range II, multiple offender for the especially aggravated robbery conviction to be served consecutively to the attempted first degree murder sentence. He was sentenced to twenty years as a Range II, multiple offender for the aggravated robbery conviction to be served consecutively to the attempted first degree murder and especially aggravated robbery sentences for a total effective sentence of ninety years. He presents the following issues:

1) that the evidence was insufficient to support his convictions for attempted first degree murder and especially aggravated robbery,

2) that the trial court erred in failing to instruct the jury regarding aggravated assault as a lesser included offense of attempted first degree murder and

3) that the sentences imposed by the trial court are excessive.

Carl Jack Edward Martin testified that he and the defendant had known each other for

eleven or twelve years. He stated that in September 1992, he agreed to allow the defendant to stay at his residence after the defendant had an argument with his father. He testified that he lived at the residence with the owner of the property, Frank Faragoh, and took care of the lawn and maintenance of the property. The defendant agreed to take care of the maintenance of the property in exchange for his room and board. Mr. Martin testified that the defendant lived in the two upstairs rooms of the house, Mr. Faragoh lived downstairs and he lived in an apartment over the garage. He testified that the defendant did not receive a set of keys to the house and was not permitted to roam around the house at night once everyone else had gone to bed.

Mr. Martin testified that he was an expert in martial arts and kept many weapons in the trunk of his car. He also stated that he kept a shotgun in the drawer of his waterbed. He reported that before leaving for work on September 3, 1992, he unloaded the shotgun and placed it inside the drawer. He said that he had a friend over that night who left the apartment around 12:30 a.m. on September 4th. After his friend left, he took a shower and went to bed.

Mr. Martin testified that he awoke during the early morning hours of September 4th to find the defendant standing over him and pointing the shotgun in his face. He stated that he grabbed the shotgun and pushed it towards the floor. He said that the defendant "kinda smiled," making him think that it was just a joke, and he let go of the shotgun. He testified that the defendant pointed the shotgun in his face once more, laid the hammer back and began to pull the trigger. He said that the defendant never said a word to him. He recounted that he grabbed the gun and yanked it away from his face just as it discharged and shot his arm. He said that he ran naked from his apartment as the defendant reloaded the shotgun. He stopped at a few houses but no one offered any assistance. He was found on Alcoa Highway and taken to the University of Tennessee Hospital where his arm was later amputated due to the severity of his injuries. After spending two weeks in the hospital, he returned home to discover that two hundred and seventy-five dollars, a Sony walkman, his business portfolio, his car keys, a cassette player and a knife had been stolen.

Mr. Faragoh testified that he met the defendant through Mr. Martin and agreed to allow the defendant to stay in his house for a week if he would clean up the property and do yardwork. He stated that the defendant had been living at the house for about three days when the offenses occurred. He said that before the offenses, there had been no problems with the defendant and he had no reason to be suspicious of the defendant. He stated that the defendant did not have any keys to the house. He also confirmed that Mr. Martin kept a shotgun in his apartment for protection.

Mr. Faragoh testified that the defendant came into his room in the early morning hours of September 4th. He said that the defendant had the shotgun and seemed to point it at him. He said that the defendant took twenty dollars from his wallet, without asking and without Mr. Faragoh offering. He said that the defendant ordered him out of his bedroom after he had taken the money. He said that the defendant led him to Mr. Martin's apartment where he saw a pool of blood on the bed and the floor. He stated that he was paralyzed with fear upon seeing the blood and could not see Mr. Martin anywhere. He said that he had not heard any shots. He stated that the defendant demanded more money. He recounted that when he told the defendant that there was not anymore money, the defendant pointed the shotgun at him. He stated that he ran into the backyard and that the defendant followed him with the shotgun pointed at him. He said that the police arrived and the defendant vanished.

He testified that he did not have a chance to call the police and later found out that they came to the house after finding Mr. Martin. He said that the police took him to the hospital to see Mr. Martin and he went

back to the house around 5:00 a.m. to go back to sleep. He awoke to the sound of Mr. Martin's car alarm and found the defendant trying to start the car. Mr. Faragoh testified that he immediately called 911. He stated that he heard the door opening and put the phone receiver down, telling the operator "I've got to get away," as the defendant kicked in the door. Mr. Faragoh stated that he offered the defendant a cup of coffee but he took a beer from the refrigerator instead. The police arrived at the residence and captured the defendant, finding the shotgun attached to his belt but hidden by an overcoat.

Gary Tipton, a Knox County Sheriff's Department patrol officer, testified that he arrived at the Faragoh residence in order to arrest the defendant. He stated that he drew his weapon because he knew that the defendant had shot Mr. Martin the night before. He recounted that he had to order the defendant to raise his hands three or four times before the defendant complied but that he took the defendant into custody without any further trouble. He stated that the defendant seemed to be under the influence of something and was very glassy-eyed. On cross-examination he added that the defendant did not act in a threatening manner but was just nonresponsive. He testified that the shotgun, a hunting knife, money, keys and a beeper were all recovered from the defendant's person.

Detective Darrell Johnson of the Knox County Sheriff's Department testified that he found Mr. Martin on Alcoa Highway around 1:15 a.m. on September 4th. He then went to the Faragoh residence and found Mr. Faragoh standing outside. He recovered a spent shotgun shell from Mr. Martin's bedroom. Detective Johnson identified photographs of the defendant after his arrest showing blood on both legs of his pants and blood on his left hand.

Mack Nix, the defendant's father, testified for the defense that he had seen the defendant earlier on September 3rd. He stated that the defendant had given him twenty dollars with which to buy cigarettes and beer. He said that the defendant had been living at the Faragoh residence since leaving his girlfriend's apartment. He said that the defendant had two hundred and fifty to three hundred dollars that night from money he had received from a construction job. He admitted that the defendant had been violent with him in the past.

The defendant testified that he was friends with Mr. Martin and that Mr. Martin allowed him to hide at the Faragoh residence while the police were looking for him for a parole violation. The defendant stated that he stayed at the house without any rules and that Mr. Faragoh would even pay for his cab rides home. The defendant said that on the night of the offense, Mr. Martin had called him to his room to talk. Mr. Martin accused the defendant of stealing some marijuana. The defendant testified that Mr. Martin came up behind him with a sword in its sheath and the defendant knocked the sword out of his hand. According to the defendant, the victim then drew the shotgun on him, the two men struggled over the shotgun and it went off. The defendant denied having the gun when he went into Mr. Faragoh's bedroom and claimed that he only went to his room for help. He said he ran outside to the woods when he saw headlights approaching the house. He testified that Mr. Martin and Mr. Faragoh were lying in their testimony. The defendant admitted to prior aggravated assault and first degree burglary convictions from which he had been on parole when he was arrested for driving under the influence.

Detective Johnson was called as a rebuttal witness and testified that the defendant had told him that Mr. Martin pulled a sword on him. He added, however, that no sword was found in Mr. Martin's bedroom.

I

The defendant contends that the evidence is insufficient to support his convictions for the especially aggravated robbery and attempted first degree murder of Mr. Martin. Our standard of review when the

sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. *See State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn.1984); *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

**A**

The defendant contends that because Mr. Martin fled the scene before any property was stolen, there was no showing that the defendant had taken property from the person of another, which he asserts is required for robbery. The defendant relies upon *Crews v. State,* 43 Tenn. (3 Cold.) 350 (1866), in which the victims, faced with a pistol and a demand for money by the defendants, rushed from their home and the defendants then took property from the home. In reversing the convictions relative to improper jury instructions, the supreme court stated that although the taking from the person requirement for the crime of robbery, as then defined, could be either actual or constructive, it could "extend no further than a taking in the presence and under the view of the party robbed." *Id.* at 353; *see Kit v. State,* 30 Tenn. (11 Hum.) 167, 168–69 (1850).

■ The state responds in its brief that no Tennessee case has been found involving a robbery victim who fled the scene after being shot, and refers us to decisions from other jurisdictions that would support a robbery conviction in this case. We acknowledge that there is substantial authority from other jurisdictions that would support a robbery conviction under the facts in this case. *See, e.g., State v. Stearns,* 61 Wash.App. 224, 810 P.2d 41–44 (1991) (taking of property was within constructive presence of victim who was assaulted and fled before property carried away); *Morgan v. State,* 195 Ga.App. 732, 394 S.E.2d 639, 641 (1990) (taking of property was sufficiently within presence of victim who fled to car after being threatened with knife); *People v. Wiley,* 112 Mich.App. 344, 315 N.W.2d 540, 541 (1981) (robbery occurred when victim fled because of violence and fear); 77 C.J.S. *Robbery* § 9 (1994) ("When perpetrators forcibly caused the victim to be away from the immediate presence of the property at the time it is stolen, the offense of robbery can still be committed."). Such references, though, are for naught if *Crews* remains valid as supreme court precedent that is binding upon us. In this respect, we do not believe that the fact that Mr. Martin was shot before he fled distinguishes the present case from *Crews.*

However, we conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that a robbery of Mr. Martin occurred, given the present state of the law. First, we note that the holding in *Crews* was somewhat limited in later cases. For instance, in *Jones v. State,* 214 Tenn. 683, 383 S.W.2d 20 (1964), a robbery conviction was upheld when a building night watchman was taped to a stool while the defendant and an accomplice robbed a safe in another part of the building. In *Morgan v. State,* 220 Tenn. 247, 415 S.W.2d 879 (1967), robbery convictions were affirmed when the victims had been bound in their home, the home ransacked, and money taken from several trunks, with the court stating that "[t]he fact the goods and money were not taken from the person of the victims is no defense." 415 S.W.2d at 881. In *State v. Edwards,* 868 S.W.2d 682, 699–700 (Tenn.Crim.App.), *app. denied* (Tenn.1993), a robbery conviction was affirmed when the victim was assaulted and forced to lock herself in her bathroom and was actually unaware of when or how the defendant stole her money from another room.

■ Second, and most important, we note that a robbery under present law does not require a "taking." Pursuant to T.C.A.

§ 39–13–401(a), robbery "is the intentional or knowing *theft of property* from the person of another by violence or putting the person in fear." (Emphasis added). Pursuant to T.C.A. § 39–14–103, a theft of property occurs "if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Thus, an offender can commit a robbery by asserting control over the property without any degree of asportation or physical taking that was required for robbery when *Crews* was decided. In other words, since 1989, if an offender, with the intent to deprive the owner, asserts control over property by means of the owner or possessor being removed from the presence of the property by force or fear, the offense of robbery is committed to the same degree that it is if the offender carries the property away from the victim's presence.

◼ In the present case, in the light most favorable to the state, the evidence shows that the defendant assaulted Mr. Martin in Mr. Martin's bedroom for the purposes of both exercising and obtaining control over Mr. Martin's property that was in the same room. It is easily concluded from the evidence that the defendant used deadly force and violence to exercise control over Mr. Martin's property by forcing Mr. Martin's removal from the presence of that property. Under these circumstances, the jury was entitled to find beyond a reasonable doubt that the defendant was guilty of especially aggravated robbery of Mr. Martin.

**B**

◼ As to his conviction for attempt to commit first degree murder, the defendant contends that he did not have the culpable mental state necessary to support the offense of first degree murder. Specifically, he argues that the evidence shows that Mr. Martin was shot only after he attempted to yank the shotgun away from him, indicating that the defendant could not deliberately and with premeditation intend to kill Mr. Martin.

The defendant was convicted of the attempt to commit an intentional, premeditated and deliberate killing of another. *See* T.C.A. §§ 39–12–101(a) and 39–13–202(a)(1). In the light most favorable to the state, the evidence shows that the defendant obtained Mr. Martin's shotgun earlier in the day, entered Mr. Martin's bedroom in the middle of the night, and aimed the shotgun at Mr. Martin's face. The circumstances of Mr. Martin pushing the shotgun away, followed by the defendant placing the shotgun in Mr. Martin's face again and beginning to pull the trigger belie any claim that the shooting resulted from Mr. Martin grabbing the shotgun. Instead, the evidence warrants a conclusion that Mr. Martin's actions saved his life. The evidence was sufficient to prove beyond a reasonable doubt that the defendant attempted to commit first degree murder.

**II**

Next the defendant contends that the trial court erred in refusing to instruct the jury regarding aggravated assault as a lesser included offense to attempt to commit first degree murder. He points to the fact that the evidence at trial would easily have supported a conviction for aggravated assault. The record on appeal reflects that before the jury instructions began, the trial court agreed to charge the jury regarding aggravated assault being a lesser included offense to especially aggravated robbery, but did not believe that the attempted first degree murder charge, as alleged, included aggravated assault as a lesser offense.

◼ Unfortunately, though, the record on appeal does not contain the instructions that were ultimately given to the jury. It is incumbent upon the appealing party to insure that the record on appeal is complete relative to all matters occurring in the trial court that relate to the issues raised on appeal. *See* T.R.A.P. 24(b); *State v. Boling,* 840 S.W.2d 944, 951 (Tenn.Crim.App.1992). For all we know, as trial courts have often done, the trial court ultimately gave the requested instruction. As a matter of policy,

without a complete record regarding the issue before us, we presume the trial court to be correct in its rulings. *State v. Jones,* 623 S.W.2d 129, 131 (Tenn.Crim.App.1981).

In any event, we do not believe that aggravated assault is, by law or allegation, a lesser included offense to the attempted first degree murder charged in this case. As a matter of law, an attempt to commit a premeditated and deliberate first degree murder, *see* T.C.A. §§ 39–12–101(a) and 39–13–202(a)(1), may be committed without necessarily including an aggravated assault. *See* T.C.A. §§ 39–13–101 and –102. Thus, it is apparent that the two offenses are separate and distinct. *See State v. Black,* 524 S.W.2d 913, 920 (Tenn.1975).

As a matter of allegation, the indictment charges that the defendant "did unlawfully, intentionally, deliberately and with premeditation attempt to commit First Degree Murder of Carl Martin...." It does not allege any specific action that would constitute an aggravated assault under T.C.A. § 39–13–102(a), such as, causing serious bodily injury or using or displaying a deadly weapon. For the purpose of instructing a jury about lesser offenses, "an offense is necessarily included in another if the elements of the greater offense, *as those elements are set forth in the indictment,* include, but are not congruent with, all the elements of the lesser." *Howard v. State,* 578 S.W.2d 83, 85 (Tenn.1979) (emphasis added). Under the indictment in this case, the defendant was not entitled to an instruction that aggravated assault was a lesser included offense of the attempted first degree murder with which he was charged.

### III

The defendant contends that the trial court imposed excessive sentences, as to both their respective lengths and consecutive nature. Under his Range II offender status, which he does not contest, the available range for the attempted first degree murder and the especially aggravated robbery was twenty-five to

forty years and the defendant received a thirty-five-year sentence for each offense. The sentencing range for the aggravated robbery was twelve to twenty years and the defendant received a sentence of twenty years. All three sentences are to be served consecutively to each other.

Appellate review of sentencing is *de novo* on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40–35–401(d) and –402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing was improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. *State v. Fletcher,* 805 S.W.2d 785, 789 (Tenn.Crim. App.1991). In this respect, the weight to be afforded any existing enhancement or mitigating factor is left to the trial court's discretion. T.C.A. § 40–35–210, Sentencing Commission Comments; *State v. Moss,* 727 S.W.2d 229, 237 (Tenn.1986); *State v. Shelton,* 854 S.W.2d 116, 123 (Tenn.Crim.App. 1992), *app. denied* (Tenn.1993).

The presentence report reflects that the defendant, at the time of sentencing, was twenty-four years old and possesses a lengthy history of convictions dating back to when he was a juvenile. His previous convictions range from aggravated burglary, aggravated assault and larceny to numerous convictions for disorderly conduct, assault and battery, possession of a deadly weapon, public intoxication, driving under the influence and shoplifting. The record reflects that the defendant was on parole at the time of the offenses. The defense put forward no mitigating circumstances.

### A

As for the lengths of the sentences, the defendant complains about the trial court's

application of certain enhancement factors and the weight given by it to other enhancement factors. In arriving at the sentences, the trial court referred to the following enhancement factors as listed in T.C.A. § 40–35–114:

(1) the defendant has a previous history of criminal convictions in addition to that necessary to establish his range;

(5) the defendant treated a victim with exceptional cruelty;

(6) Mr. Martin's personal injuries were particularly great;

(8) the defendant has a previous history of unwillingness to comply with conditions of release into the community;

(9) the defendant employed a firearm during the commission of the offenses;

(10) the defendant had no hesitation about committing a crime in which the risk to human life was high;

(11) the defendant caused bodily injury while having a previous felony conviction involving bodily injury;

(13)(B) the defendant committed the felony offenses while on parole and

(16) the defendant committed a crime under which the potential for bodily injury was great.

The trial court stated that it gave factor (5) little weight and that several of the enhancement factors "overlap," mentioning that the victim's injuries fit into several categories and should not be considered more than once.[1] The defendant targets factors (6), (10), (11) and (16) as ones that should not apply.

■■■■ Relative to the attempted first degree murder, we believe that factors (6) and (11) were properly used. Particularly great injuries are not essential to the commission of this offense, but prove greater culpability. Also, the record reflects that the defendant was previously convicted of an aggravated assault that involved a stab wound. However, we agree with the defendant that factors (10) and (16) should not have been applied because the risk to human life and the great potential for bodily injury always exist with an attempted first degree murder. On the other hand, the remaining enhancement factors, particularly relating to the defendant's history of criminal behavior, previous lack of rehabilitation, and continued use of violence, justify the thirty-five-year sentence imposed by the trial court.

■■■■ Relative to the especially aggravated robbery, we believe that factor (11) was properly applied for the same reason it applied to the attempted first degree murder conviction. However, we believe that factors (6), (10) and (16) should not be applied because they are essentially elements of the offense. Pursuant to T.C.A. § 39–13–403(a), especially aggravated robbery requires that the robbery be accomplished with a deadly weapon and that the victim suffer serious bodily injury. "[P]roof of serious bodily injury will always constitute proof of particularly great injury." *State v. Jones*, 883 S.W.2d 597, 602 (Tenn.1994). Moreover, there is necessarily a high risk to human life and the great potential for bodily injury whenever a deadly weapon is used. *See State v. Hill*, 885 S.W.2d 357, 363 (Tenn.Crim.App.), *app. denied* (Tenn.1994); *State v. Hicks*, 868 S.W.2d 729, 732 (Tenn.Crim.App.1993). In this regard, we note that factor (9), the possession or use of a deadly weapon, should not apply either because it, too, involves an element of the offense. Thus, factors (6), (9), (10) and (16) should not be used to enhance this sentence. On the other hand, as with the attempted first degree murder, we believe that the remaining factors fully support the thirty-five-year sentence imposed by the trial court.

■■■■ Relative to the aggravated robbery of Mr. Faragoh, it is apparent that factors (6), (9), (10), (11) and (16) would not apply.

---

1. Unfortunately, the trial court failed to specify as to each factor the particular offense to which it applied. Often, such a failure will require a remand because it leaves us and the parties on appeal the difficult, sometimes impossible, task of deciphering a trial court's reasons for each particular sentence. However, we believe that the record is sufficient to justify our resolving the sentencing issues in this appeal without a remand.

Yet again, the remaining factors justify the sentence imposed by the trial court.

**B**

 Finally, the defendant contests the imposition of consecutive sentences, claiming that the trial court failed to consider his youth, the "relatively minor crimes" committed in his past and his potential for rehabilitation. The trial court found that the defendant is an offender whose record of criminal offenses is extensive, *see* T.C.A. § 40–35–115(b)(2), and that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *See* T.C.A. § 40–35–115(b)(4). In addition to a finding by a preponderance of the evidence that section 115(b) criteria for consecutive sentencing exist, consecutive sentencing depends upon further findings that an extended sentence is necessary to protect the public against the defendant's future criminal conduct and that the consecutive sentences will reasonably relate to the severity of the offenses committed. *State v. Wilkerson,* 905 S.W.2d 933, 939 (Tenn.1995).

 The defendant's record shows continuous criminal behavior. He has displayed few signs of rehabilitation or improvement over his extensive criminal history and his behavior has, in fact, progressed to more violent offenses. The present offenses are particularly violent and severe in nature. The defendant's arguments for concurrent sentences are simply not supported by the record. Under all of the circumstances, the record justifies conclusions that extended sentences are necessary to protect the public against the defendant and that the sentences as imposed reasonably relate to the severity of his offenses.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed in all respects.

WADE, J., and ROBERT E. BURCH, Special Judge, concur.