## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
## NOVEMBER SESSION, 1997



FILED

March 31, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

STATE OF TENNESSEE,   )
          )
    Appellee     )   No. 02C01-9705-CR-00192
          )
          )   SHELBY COUNTY
vs.           )
          )   Hon. Arthur T. Bennett, Judge
DERRICK McCLURE,   )
          )   (First Degree Murder;
    Appellant   )   Criminal attempt to commit
                 first degree murder; two counts
                 of especially aggravated robbery)

For the Appellant:

**Joseph S. Ozment**
Attorney at Law
217 Exchange Avenue
Memphis, TN 38105

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Deborah A. Tullis**
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

**William Gibbons**
District Attorney General

**Thomas Henderson and
Glen Baity**
Asst. District Attorneys General
Criminal Justice Complex
Suite 301, 201 Poplar Street
Memphis, TN 38103

OPINION FILED: _____

AFFIRMED

**David G. Hayes**
Judge

# **O P I N I O N**

The appellant, Derrick McClure, appeals his convictions for first degree murder, criminal attempt to commit first degree murder, and two counts of especially aggravated robbery. Following a jury trial, the Shelby County Criminal Court sentenced the appellant to an effective sentence of life plus twenty-five years in the Tennessee Department of Correction. In this appeal, the appellant raises the following issues for our determination:

> (1) Whether the evidence is sufficient to sustain his convictions for first degree murder, attempt to commit first degree murder, and two counts of especially aggravated robbery;
>
> (2) Whether the trial court erred in admitting into evidence the appellant's oral and written statements to officers of the Memphis Police Department; and,
>
> (3) Whether the trial court properly sentenced the appellant.

After review, we affirm the judgment of the trial court.

## **Background**

On April 16, 1994, the appellant, Charles Speed, and Harry Robinson, all juveniles, made plans to rob a convenience store.[1] Their strategy included locating a store without a video camera and shooting the clerks in order to prevent their identification. They further discussed "who was going to shoot them, who was going to get the money, . . .who was going to be the lookout, and where [they] were going to go once [they] did it." The three then proceeded to "some girl's house" in East Memphis and then to "Hyde Park to get the gun." Once the group had obtained the gun, they rode around until they located the Liberty Grocery Store.

---

[1]The appellant was sixteen years old when the offenses were committed.

The appellant, Speed, and Robinson entered the store and attempted to purchase some beer. Sung Su Kim, the proprietor of the family owned business, refused to sell the beer to the juveniles because they appeared to be underage and they did not have proper identification. The three teenagers returned the beer to the cooler and left the store. Soon thereafter, one of the juveniles reentered the store and explained to Mr. Kim that he had identification. Mr. Kim responded that, although he may have proper identification, state law requires a person to be twenty-one years of age to purchase beer. The juvenile then left the store.

Chae Kim, Mr. Kim's aunt, who was also working in the store that day, went outside to get some fresh air. When she returned, she informed Mr. Kim that the trash needed to be taken to the dumpster. "A minute or two" after Mr. Kim had returned from the dumpster, he heard a voice from behind him. Mr. Kim turned and saw the three juveniles who had earlier attempted to purchase the beer. The appellant, armed with a pistol, shot Mr. Kim in the face and then in the chest. Kim fell to the floor, whereupon the appellant again shot Mr. Kim; this time in the leg. Then, reaching over the counter, the appellant fatally shot Chae Kim, who was crouched in fear behind the store counter. Ms. Kim was shot once in the head. After the shooting had ceased, one of the juveniles attempted to open the cash register, but was unsuccessful. The teenagers gathered fourteen or fifteen dollars, some coins and some food stamps which were laying on the floor, and fled the store. Mr. Kim, unable to stand, crawled toward the telephone in an effort to dial "911."

Carolyn Gunn, a neighborhood resident, and her teenage son, Kevin Parker, were outside the store when Kevin warned her "Mama, don't go in the store. There's shooting in there." A minute later, Mrs. Gunn observed a "guy run out the store" and get into a white car containing two other people. Although Mrs. Gunn did not recognize the person leaving the store, her son exclaimed, "Mama, that's Derrick!" Kevin explained that he recognized the appellant because "Derrick" had dated his cousin and

3

attended Humes High School.  Upon entering the store, Mrs. Gunn found Mr. Kim "standing up on the outside of the counter with the phone."  She also observed "[Chae Kim] lying over behind the counter."  Mrs. Gunn told Mr. Kim to lie on the floor, took the telephone from him, and dialed "911."

Later that evening, Memphis Police Officers Donald Dickerson and Jerry Collard proceeded to the appellant's residence and placed him under arrest for the robbery of the grocery store.  Subsequent to his arrest, the appellant made two statements admitting his involvement in the crimes.  The first statement was made after the appellant was arrested and placed in the squad car for transporting to the police station. No Miranda warnings were provided on this occasion.  The second statement involved a written statement on the following day given in the presence of his adult sister and after being provided Miranda warnings.  In the written statement, the appellant admits that the three planned the robbery of the Liberty Grocery.  Additionally, he admits that he was present and participated in the robberies by the taking of money and food stamps.  In his statement, he denies, however, that he was the person who shot either of the victims.  Both statements were admitted into evidence.[2]  At trial, Mr. Kim identified the appellant as the person who shot him in the face, chest and leg. Additionally, Kevin Parker identified the appellant as one of the two individuals who he saw running out of the grocery store, after hearing gunshots.

Based upon this evidence, the jury found the appellant guilty of first degree murder, attempted first degree murder, and two counts of especially aggravated robbery.  A sentence of life with the possibility of parole was imposed for the first degree murder conviction.  At a subsequent sentencing hearing, the trial court imposed twenty-five year sentences for each of the remaining convictions.  The court further ordered that the sentence for attempted first degree murder run consecutively to his life

---

[2]No incriminating statement was made by the appellant in his oral statement to the police that was not included in his more comprehensive written statement.

4

sentence.

## I. Motion to Suppress

Prior to trial, the appellant filed a motion to suppress both the oral statement given to police immediately following his arrest and the subsequent written statement to law enforcement officers taken at juvenile court. The appellant's challenge to the first statement is based upon failure to provide Miranda warnings. He argues that the second statement was "fruit of the poisonous tree," resulting from the illegally obtained oral statement. Alternatively, the appellant asserts that his written statement is not admissible as it was the result of coercion and threats and, therefore, not voluntary.

At the hearing on the motion, the State presented the testimony of Officer Donald Dickerson and Sergeant Michael Fuller. Officer Dickerson testified that, on April 17, 1994, after receiving information that the appellant "might be responsible for a robbery," he proceeded to the appellant's residence, placed the appellant under arrest, and seated him in the backseat of his patrol car. The appellant asked why he was being arrested. Dickerson replied that "he had been named possibly being responsible for a robbery." At no time was the appellant provided Miranda warnings. No other conversation was initiated by Officer Dickerson. Dickerson testified that, at this point, the appellant "arbitrarily blurted out these statements to me about these other individuals that were with him and which were responsible for actually pulling the trigger." The appellant was then transported to juvenile court. Officer Dickerson subsequently reduced the appellant's oral statements to writing and included them in his arrest report.

At juvenile court on the following day, the appellant was questioned by Sergeant

5

Fuller.  Prior to this questioning, however, the appellant was orally advised of his Miranda rights, read a written advisement of these rights, and subsequently signed a written waiver of these rights.  The appellant's sister was present during both waiver of rights and his following statement.  This statement was contemporaneously transcribed by Sergeant Billy Garrett.  At the conclusion of his statement, the appellant and his sister read the statement and initialed it as correct.  Sergeant Fuller testified that no force, threat, or coercion was used in order to obtain the statement.  Indeed, he stated that both the appellant and his sister were very cooperative.

The appellant testified that he was not initially questioned by the police officers upon being placed under arrest.  However, after he was placed in the backseat of the patrol car, the police began to question him regarding the identity of the trigger man and "all of that."  He stated that, at no time, was he advised of his Miranda rights.  The appellant explained that there were "about fifteen or twenty" police officers present and approximately "ten or eleven" patrol cars.  He stated that Officer Dickerson was not the officer who questioned him.  Notwithstanding the alleged police initiated questioning by the unidentified police officer, the appellant denies that he made the incriminating statements attributed to him on this occasion, except for stating that he was "with Charles Speed when the incident happened."  He concedes, however, that prior to the written statement, he was provided his Miranda rights.  Nonetheless, he maintains that his second statement was not given freely and voluntarily because the officers informed him that "if [he] didn't talk to them [he] would be in prison a [long period] of time."  He admitted on cross-examination that he provided the statement in belief that he would "get out of jail faster."  The appellant also conceded that he had previously been arrested as a juvenile between seven and ten times.

**A. Oral Statement**

The trial court admitted the appellant's alleged oral statement finding that, because the appellant denied making any statement, he lacked standing to challenge its admission.[3] We find admission of the statement upon this ground erroneous.

The privilege against self-incrimination prohibits the State from compelling an individual to incriminate himself. U.S. CONST. amend V. See generally Estelle v. Smith, 451 U.S. 454, 462-463, 101 S.Ct. 1866, 1872-1873 (1981). Therefore, any person providing a statement which was compelled by the State has standing to challenge the manner in which the statement was procured, if that statement could be used in future criminal proceedings against him. See generally Kastigar v. United States, 406 U.S. 441, 444-445, 92 S.Ct. 1653-1656 (1972). Whether or not the alleged speaker concedes or denies making the incriminating statement is irrelevant in determining standing. Rather, the issue of standing focuses upon whether the challenger is the speaker of the statement, whether the statement is potentially incriminating against him, and whether the statement was procured as a result of State action. Cf. Jackson v. Denno, 378 U.S. 368, 376-77, 84 S.Ct. 1774, 1780-1781 (1964). In the present case, the appellant is the speaker, the statement is potentially incriminating, and the statement was the result of some level of police action. Thus, the appellant may challenge the admissibility of the oral statement.

Therefore, the issue remains whether the statements are admissible.

A defendant must be provided warnings about the exercise of his constitutional rights whenever he is subjected to "custodial interrogation." See Berkemer v. McCarty, 468 U.S. 420, 434, 104 S.Ct. 3138, 3147 (1984); United States v. Murphy, 107 F.3d 1199, 1204 (6th Cir. 1997) (citing Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966)). Absent such procedural safeguards, any statement subsequently

---

[3]The trial court's ruling ended with its determination that the appellant lacked standing to challenge the admissibility of his statement. Accordingly, we are denied the benefit of the trial court's reasoning as to the statement's admissibility within the context of the appellant's Fifth Amendment rights.

provided is not admissible at trial.[4] Miranda, 384 U.S. at 477-478, 86 S.Ct. at 1629-1630. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda. Oregon v. Elstad, 470 U.S. at 307, 105 S.Ct. at 1292. However, where a defendant makes a statement without being questioned or pressured by a government agent, the statement is admissible, despite the absence of Miranda warnings, if the statement was freely and voluntarily made by the defendant. Colorado v. Connelly, 479 U.S. 157, 164, 107 S.Ct. 515, 520 (1986); Michigan v. Tucker, 417 U.S. 433, 441, 94 S.Ct. 2357, 2362 (1974); Jackson v. Denno, 378 U.S. at 376-377, 85 S.Ct. at 1780-1781; Murphy, 107 F.3d at 1199; see also State v. Hurley, 876 S.W.2d 57, 66 (Tenn. 1993).

There is no dispute that the appellant was not advised of his Miranda rights and that the appellant was in custody prior to the alleged oral statement. Thus, the issue central to our determination of the statement's admissibility is whether the statement was a response to interrogation.[5] The trial court's findings regarding the oral statement suggest that the element of interrogation was present.[6] Notwithstanding this finding, we acknowledge that the State's witness denied any police initiated interrogation. This issue is further complicated by the appellant's allegation of questioning by an unidentified police officer, defense counsel's argument that the statements of the juvenile appellant are incredulously out-of-character for a sixteen year old based upon

---

[4]Despite the fact that patently voluntary statements taken in violation of Miranda must be excluded from the prosecution's case, the presumption of compulsion does not bar their use for impeachment purposes on cross-examination. Oregon v. Elstad, 470 U.S. 298, 307, 105 S.Ct. 1285, 1292 (1985).

[5]Interrogation occurs whenever a person in custody is subjected to either express questioning or its functional equivalent by law enforcement officials. See Rhode Island v. Innis, 446 U.S. 291, 300-02, 100 S.Ct. 1682, 1689-90 (1980).

[6]    Well, I'm looking at the whole picture. But I've got to look at what he said about this statement. He said he didn't make it. The officer said he did. So he's denying he made this statement to the officer. In fact, he said he didn't say it to Officer Dickerson anyway. But he said it to another officer that was there, too. I mean, the other officer questioned him, but he said he didn't make the statement.

(emphasis added).

8

the pervasive use of police jargon attributed to him, and the State's failure, at the suppression hearing, to produce the other officer who was in the patrol car and who was the alleged interrogator.[7]  Moreover, the appellant has failed to include exhibit A, the oral statement, in the record for our review.  Given the circumstances surrounding this issue and the ambiguous posture of the trial court's finding, we are unable to determine whether the element of interrogation was present.  Although remand to the trial court is typically required for determination of this issue, we find such action unnecessary.   Assuming for argument's sake that the appellant's statement was, in fact, not admissible, we conclude that, given the overwhelming nature of the convicting evidence, any error in its admission was harmless.  See  Tenn. R. App. P. 36(b); Hartman v. State, 896 S.W.2d 94, 100 (Tenn. 1995).  This issue is without merit.

### B.  Written Statement

The appellant next contends that his written statement is inadmissible as it is inherently tainted from the illegality of the oral statement.  In the alternative, he argues that, regardless of the taint of the oral statement, the written statement was a product of police compulsion and is, therefore, not voluntary.  We reject both of the appellant's arguments.

---

[7]Defense counsel supported his argument by reading the appellant's alleged oral statement, accompanied by trial counsel's comments, into the record:

> "He was with Mr. Charles Speed. He didn't say Mr. Speed. He said, Mr. Charles Speed or Charlie. I mean, this was Mr. Charles Speed. This was what Officer Dickerson heard when the incident happened, when the incident happened. Derrick McClure then went on to state that he and Charles and a third suspect named Harry entered the store to buy beer. The clerk inside the store refused to sell the subjects, according to Derrick. The trio then left the store and returned to rob the business after a suggestion from Charles."
> . . .
>
> "McClure then stated that Charles, armed with a possible -- a possible." It didn't say armed with a gun. It says, ". . . armed with a possible 25-automatic." I'm assuming Mr. McClure then told the officers, "Well, he had a possible 25-automatic" not just a gun. "Entered the store with the others and fired several shots at two clerks." Not just the people, but the clerks. ". . .striking both subjects. The McClure subject then stated they fled the scene in a white Pontiac four door."

The appellant argues that his subsequent written statement was "fruit of the poisonous tree," because his initial oral statement was obtained in violation of his Fifth Amendment rights. See State v. Smith, 834 S.W.2d 915, 919 (Tenn. 1992); see also United States v. Bayer, 331 U.S. 532, 540, 67 S.Ct. 1394, 1398 (1947). Initially, we note that the appellant's theory of "fruit of the poisonous tree" is inconsistent with his argument denying any oral statement. A "taint" cannot carry from a non-existent statement. Notwithstanding, in view of our previous ruling implicitly finding that a statement was made, we elect further review. Necessarily, the applicability of this theory to the present case depends upon whether interrogation existed at the time of the initial oral statement. Nonetheless, an initial, illegally-obtained confession does not necessarily bar the prosecution from obtaining a subsequent, admissible confession from the defendant. Smith, 834 S.W.2d at 919. A subsequent statement is admissible if the State can establish "that the taint is so attenuated as to justify admission of the subsequent confession." Smith, 834 S.W.2d at 919 (citing Elstad, 470 U.S. at 335, 105 S.Ct. at 1306-07 (Brennan, J., dissenting)). In such cases, the crucial inquiry for the court is

> whether the events and circumstances surrounding and following the
> initial, illegal conduct of the law enforcement officers prevented the
> accused from subsequently (1) making a free and informed choice to
> waive the state constitutional right not to provide evidence against one's
> self; and (2) voluntarily confessing his involvement in the crime.

Id. Thus, even if the initial oral statement is inadmissible as violative of Miranda, the appellant's subsequent written statement is not automatically excluded.

Inherent in the admissibility of the written statement is that the statement was voluntarily given by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. See Miranda v. Arizona, 384 U.S. at 444, 467, 86 S.Ct. at 1612, 1624; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992), cert. dismissed, 510 U.S. 124, 114 S.Ct. 651 (1993). The appellant contends that his waiver of his constitutional rights was not voluntarily entered as he was compelled by coercive police tactics to provide an inculpatory statement.

10

The voluntariness test under the Tennessee Constitution is more protective of individual rights than the test under the United States Constitution. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). To be effective, the waiver must be made with the defendant's personal awareness of both the nature of the right and the consequences of abandoning his rights. See Stephenson, 878 S.W.2d at 544-545. Additionally, the waiver cannot be the result of intimidation, coercion or deception. Id. In determining whether a waiver was voluntary, the reviewing court looks at the totality of the circumstances surrounding the relinquishment of the right. See Stephenson, 878 S.W.2d at 545.

In the present case, the appellant, accompanied by his sister, was orally advised of his Miranda rights. He was then permitted to read a written advisement of these rights. The appellant and his sister subsequently signed a written waiver of these rights. Despite the appellant's allegations of coercion, Sergeant Fuller testified that the appellant was never threatened, both the appellant and his sister were cooperative, and both later signed the transcribed statement as correct. Moreover, the record indicates that the appellant has a lengthy record of previous arrests.

The trial court found the appellant's waiver to be valid and knowingly entered. The court's determination that a confession was given knowingly and voluntarily is binding upon the appellate courts unless the appellant establishes that the evidence in the record preponderates against the trial court's ruling. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The record supports the trial court's ruling. Thus, we conclude that the written statement, standing alone, is admissible.

Our determination as to the admissibility of the written statement is not conclusive. Rather, the issue of its admissibility focuses upon the legality of the prior oral statement. However, even if the oral statement is violative of the Fifth Amendment, the subsequent written statement is admissible if sufficient circumstances exist to

11

remove any taint of compulsion.

In State v. Smith, our supreme court listed nine factors to be utilized in determining whether the initial, illegal conduct prevents the admissibility of a subsequent valid confession:

> (1) The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;
>
> (2) The temporal proximity of the prior and subsequent confessions;
>
> (3) The reading and explanation of Miranda rights to the defendant before the subsequent confession;
>
> (4) The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;
>
> (5) The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;
>
> (6) The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel if desired;
>
> (7) The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;
>
> (8) Whether the defendant initiated the conversation that led to the subsequent confession; and
>
> (9) The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered Miranda rights.

Smith, 834 S.W.2d at 919-920.

After a review of the circumstances surrounding both the oral and the written statements, we conclude that the written confession, which was preceded by proper Miranda warnings, is not tainted by the prior oral statement, regardless of the determination of its illegality. The written statement was taken by officers other than

12

those who had initially arrested the appellant, the appellant's sister was present at the time of the statement, the appellant was familiar with the criminal justice system, the questioning did not take place over an extended period of time, and there is no indication of any overreaching or coercive tactics by the interrogators. Accordingly, the appellant's written statement was sufficiently removed from any taint from the previous oral statement and, therefore, was properly introduced at trial, regardless of the oral statement's admissibility. This issue is without merit.

## II. Sufficiency of the Evidence

The appellant next contends that the evidence is insufficient to support his convictions for first degree murder, attempted first degree murder, and especially aggravated robbery.

When reviewing a trial court's judgment, the appellate court will not disturb a verdict of guilt unless the facts of the record and inferences which may be drawn from it are insufficient as a matter of law for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In other words, this court will not reevaluate or reweigh the evidence brought out at trial. It is presumed that the judge or jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W. 2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level. Grace, 493 S.W.2d at 476.

First degree murder not committed in the perpetration of a crime requires the

"intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1994 Supp.). Moreover, an attempt to commit first degree murder requires the State to prove that the appellant, acting with the kind of culpability otherwise required for the offense, see supra:

> (2) Act[ed] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part.

Tenn. Code Ann. § 39-12-101(a) (1991).

The appellant argues that the evidence is insufficient to support the element of premeditation. The element of premeditation requires a previous intent to kill. State v. Brown, 836 S.W.2d 530, 538 (Tenn. 1992). Moreover, "premeditation" necessitates the "exercise of reflection and judgment," Tenn. Code Ann. § 39-13-201(b)(2) (1994 Supp.), "includ[ing] instances of homicide committed by poison or lying in wait," and requiring "a previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). The element of premeditation is a question for the jury and may be inferred from the manner and circumstances of the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994).

In his statement introduced at trial, the appellant admits that he was involved in planning the robbery of the Liberty Grocery Store and was present at the grocery when the two victims were shot.[8] Additionally, the appellant admits that ". . . me and Charles picked up some money off the floor. It was a lot of quarters and stuff." At trial, Mr. Kim identified the appellant as the person who shot him. Clearly, from this proof, a rational trier of fact could have found the appellant guilty of the attempted first degree murder

---

[8]Relevant portions of the appellant's statement read into evidence established:

> We talking who was going to shoot them, who was going to get the money and who was going to be the lookout and where we were going to go once we did it.
> . . .
> . . .I need to say that we planned to go into the store, shoot the clerks, let one person come back out to the car. And then the others were to get the money out of the register.

of Mr. Kim and first degree murder of Ms. Kim. Tenn. R. App. P. 13(e). See State v. Bland, No. 02C01-9412-CR-00281 (Tenn. Crim. App. at Jackson, Mar. 27, 1996), reh'g denied, (Tenn. Crim. App. May 1, 1996) (evidence of use of deadly weapon on unarmed victim, preparations prior to killing for purposes of concealment, and cruelty of killing are relevant circumstances in establishing premeditation). Moreover, these facts also overwhelmingly support proof that the appellant obtained money from the two victims by violence, accomplished by a deadly weapon and resulting in serious bodily injury. Tenn. Code Ann. §§ 39-13-401, 39-13-403 (1991). This issue is without merit.

### III. Sentencing

In the appellant's final issue, he contends that the trial court erred by imposing an effective sentence of twenty-five years to run consecutive to his life sentence. First, he contends that the trial court misapplied six enhancing factors resulting in an excessive sentence. Second, he argues that the trial court erred in imposing consecutive sentences. Review, by this court, of the length, range, or manner of service of a sentence is *de novo* with a presumption that the determination made by the trial court is correct. Tenn. Code Ann. § 40-35-401(d)(1990). This presumption only applies, however, if the record demonstrates that the trial court properly considered relevant sentencing principles. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In making our review, this court must consider the evidence heard at trial and at sentencing, the presentence report, the arguments of counsel, the nature and characteristics of the offense, any mitigating and enhancement factors, the appellant's statements, and the appellant's potential for rehabilitation. Tenn. Code Ann. §§ 40-35-102 (1994 Supp.),-103(5) (1990),-210(b)(1990); see also State v. Byrd, 861 S.W.2d 377, 379 (Tenn. Crim. App. 1993) (citing Ashby, 823 S.W.2d at 168). The burden is on the appellant to show that the sentence imposed was improper. Sentencing Commission Comments, Tenn. Code Ann. § 40-35-401(d).

## A. Enhancement Factors

First, the appellant contends that the trial court erroneously applied the following enhancement factors:

(2) The defendant was a leader in the commission of an offense involving two or more criminal actors. Tenn. Code Ann. § 40-35-114(2)(1994 Supp.);

(6) The personal injuries inflicted upon or the amount of damage done to property sustained by or taken from the victim was particularly great. Tenn. Code Ann. § 40-35-114 (6);

(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense. Tenn. Code Ann. § 40-35-114(9);

(10) The defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(10);

(12) During the commission of the felony, the defendant willfully inflicted bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim. Tenn. Code Ann. § 40-35-114(12); and

(16) The crime was committed under circumstances under which the potential for bodily injury to a victim was great. Tenn. Code Ann. § 40-35-114(16).[9]

Tenn. Code Ann. § 40-35-114(2)

With respect to Tenn. Code Ann. § 40-335-114(2), the proof does not preponderate against the trial court's finding that the appellant was a leader in the commission of the offense. The record supports this finding as to both the especially aggravated robbery counts and attempted first degree murder. The record establishes that the appellant discussed the robbery and shooting with his companions and he carried the only weapon used in the crimes into the store. He shot both Sung Kim and his aunt, Chae Kim.

---

[9]The trial court did not find any mitigating factors applicable. This finding is not challenged on appeal.

16

<u>Tenn. Code Ann. § 40-35-114 (6)</u>

The State concedes that Tenn. Code Ann. § 40-35-114(6), that the personal injury inflicted upon the victim was particularly great, was misapplied to the two counts of especially aggravated robbery. This enhancing factor cannot be used to enhance especially aggravated robbery because it is an element of that offense. <u>State v. Jones</u>, 883 S.W.2d 597, 602 (Tenn. 1994). However, this factor applies to the appellant's conviction for criminal attempt to commit first degree murder because personal injury is not inherent in that particular offense. <u>State v. Nix</u>, 922 S.W.2d 894, 903 (Tenn. 1995).

<u>Tenn. Code Ann. § 40-35-114(9)</u>

The State also concedes that the use of a deadly weapon as codified in Tenn. Code Ann. § 40-35-114(9) is inapplicable to the offense of especially aggravated robbery because it is an element of that crime. Tenn. Code Ann. § 39-13-403. However, we find that Tenn. Code Ann. § 40-35-114(9) applies to the appellant's conviction for criminal attempt to commit first degree murder. The use of a deadly weapon is not an essential element of this offense. <u>State v. Roberts</u>, No. 01C01-9603-CC-00082 (Tenn. Crim. App. at Nashville, Jan. 30, 1997).

<u>Tenn. Code Ann. § 40-35-114(10)</u>

With respect to Tenn. Code Ann. § 40-35-114(10), the defendant had no hesitation about committing a crime in which the risk to human life is high, "this court has consistently held that this factor should not be applied when the only person subject to being injured is the victim. . . ." <u>State v. Makoka</u>, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994); <u>see</u> <u>also</u> <u>State v. Claybrooks</u>, 910 S.W.2d 868, 872 (Tenn. Crim. App. 1994). In this case, the only people subject to injury were the Kims who were alone in the store. Separate convictions were obtained for each offense committed against the Kims. Accordingly, this factor is inapplicable to any of the appellant's convictions.

17

Tenn. Code Ann. § 40-35-114(12)

With respect to Tenn. Code Ann. § 40-35-114(12), the defendant willfully inflicted bodily injury upon the victim, this factor applies only to the attempted first degree murder of Mr. Kim. Although the crime of attempted murder holds a potential for bodily injury, such injury is not inherent in the offense. State v. Trusty, 919 S.W.2d 305, 313 (Tenn. 1996). On the other hand, this enhancement factor is inapplicable to the especially aggravated robbery offenses because bodily injury is an essential element of that offense. Tenn. Code Ann. § 39-13-403.

Tenn. Code Ann. § 40-35-114(16)

With respect to Tenn. Code Ann. § 40-35-114(16), the crime was committed under circumstances under which the potential for bodily injury was great, this factor is inapplicable to either the offense of especially aggravated robbery, Claybrooks, 910 S.W.2d at 872, or attempted first degree murder. Nix, 922 S.W.2d at 903 (1995).

In sum, we find that only enhancing factor (2) applies to the appellant's convictions for especially aggravated robbery.[10] Tenn. Code Ann. § 40-35-114(2) Regarding the appellant's crime of attempted first degree murder, we find these factors apply: Tenn. Code Ann. § 40-35-114(2), -114(6), -114(9), and -114(12). In determining the appropriate sentence for a felony conviction, Tenn. Code Ann. § 40-35-210 instructs the sentencing court that "[t]he presumptive sentence shall be the minimum sentence in the range . . . if there are enhancement and no mitigating factors, the court is free to increase the defendant's sentence within the standard range as the court

---

[10]We note that the pre-sentence report indicates that the appellant had approximately seven charges filed against him as a juvenile. These charges included weapons offenses, theft of property, assault, and drug charges. Because all of these alleged delinquent charges were adjudicated non-judicially by the Shelby County Juvenile Court, they are not eligible for sentencing consideration with the purview of Tenn. Code Ann. § 40-35-114(1).

deems appropriate after considering all the aspects of the case. Although the trial court misapplied several enhancing factors, we conclude that the sentences imposed are justified after *de novo* review of all the evidence required to be considered as contemplated by Tenn. Code Ann. § 40-35-210.

## B. Consecutive Sentences

Finally, the appellant argues that the trial court erred when it ordered that the appellant's sentence of twenty-five years for criminal attempt to commit first degree murder be served consecutively to his life sentence for first degree murder. Although the trial court did not expressly find the appellant to be a dangerous offender, the court ordered consecutive sentences after observing that, "based on all the facts and circumstances," the appellant's behavior "indicates little or no regard for human life" and that the appellant "had no hesitation about committing a crime in which the risk to human life was high." See Tenn. Code Ann. § 40-35-115(b)(4) (1990). The appellant contends that the record does not support the classification as a "dangerous offender." Specifically, he argues that, because of the appellant's youth, consecutive sentences are not "necessary to protect society from further criminal conduct of the [a]ppellant."

Consecutive sentences may be imposed when a defendant is convicted of more than one criminal offense. Tenn. Code Ann. § 40-35-115. However, prior to the imposition of consecutive sentences, the trial court must determine that one or more of a statutorily enumerated list of criteria exists, including, that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115 (b)(4). In Gray v. State, 538 S.W.2d 391,393 (Tenn. 1976), our supreme court held that "[a] defendant may be classified as a dangerous offender if the crimes for which he is convicted indicate that he has little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." See Tenn. Code Ann. §40-35-115(b)(4); State v. Wilkerson, 905 S.W.2d 933, 937 (Tenn.

1995). If a court decides to impose consecutive sentences based upon the inherently dangerous nature of the instant offenses, the court should base its decision upon the presence of aggravating circumstances and not merely on the fact that two or more dangerous crimes were committed. Gray, 538 S.W.2d at 393. In the present case, the appellant and his codefendants strategically planned to rob a convenience store without a video camera in order to avoid apprehension. Further, they agreed to shoot the clerks to prevent any witness from revealing their identity. The appellant walked into the store and shot two unsuspecting victims. After shooting Mr. Kim in the face and chest, the appellant continued to shoot his victim as Kim attempted to crawl across the floor. Then, he reached over the counter and shot Ms. Kim as she sat crouched behind the counter in fear. The callousness of these acts and the appellant's indifference to human life is apparent. The profit gained from the death of Chae Kim and the serious injury to Sung Su Kim amounted to fourteen or fifteen dollars, some coins, and some food stamps. This proof clearly establishes that the appellant had no hesitation about committing a crime when the risk to human life was high and that the appellant has little or no regard for human life. Accordingly, the trial court's classification of the appellant as a dangerous offender is warranted.

However, the classification as a "dangerous offender" alone is not sufficient to sustain the imposition of consecutive sentences. Wilkerson, 905 S.W.2d at 938. Before consecutive sentences may be discretionarily imposed, "the proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." Id. The record before us does not reflect these considerations by the trial court. Nonetheless, upon de novo review, the record establishes the heinous and cruel nature of the strategically orchestrated crimes committed by the appellant. Additionally, even in considering his youth, the appellant's juvenile record reflects a sustained contempt for law and order. Despite placement in at least five different youth programs, the appellant's criminal conduct continued to progress toward more violent

crimes.[11]   The appellant has failed to demonstrate the propriety of concurrent sentences.  With consideration of the appellant's youth, his prior criminal record, and the severity of the offenses for which he stands convicted, the record supports the fact that extended sentences are necessary to protect the public against the appellant and that the sentences as imposed reasonably relate to the severity of his offenses.  See, e.g., State v. Nix, 922 S.W. 2d 894,904 (Tenn. Crim. App. 1995), perm. to appeal denied, (Tenn. 1996).  Accordingly, we find, upon *de novo* review, the imposition of consecutive sentences warranted under the law and the facts.  This issue is without merit.

## Conclusion

A review of the record in the case *sub judice* reveals that the trial court's denial of the appellant's motion to suppress his oral statement on the basis of standing was erroneous.   Notwithstanding this error and our inability to resolve the relevant suppression issues, we find that, if any error existed as to the oral statement's admissibility, the admission of this statement was harmless.  Furthermore, we find the appellant's remaining issues to be without merit.   Accordingly, the appellant's convictions and sentences are affirmed.

---

[11]Programs and/or custodial environments included: Hanover House, Youth Services, About Face, After Care and Shelby Training Center.  Although the appellant did not testify at either his trial or sentencing hearings, the record indicates that he has an eighth grade education.  He was expelled from the eighth grade after assaulting his principal.

_____
DAVID G. HAYES, Judge


CONCUR:


_____
GARY R. WADE, Judge


_____
JOE G. RILEY, Judge